REVISED DECEMBER 12, 2007

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 15, 2007

Charles R. Fulbruge III
Clerk

No. 05-70059

PATRICK HORN,

Petitioner-Appellant,

versus

NATHANIEL QUARTERMAN, Director, Texas
Department of Criminal Justice,
Correctional Institutions Division,

Respondent-Appellee.

Appeal from the United States District Court
for the Eastern District of Texas

Before GARWOOD, BARKSDALE, and GARZA, Circuit Judges.

GARWOOD, Circuit Judge:

Petitioner-appellant Patrick Horn (Horn) was convicted of capital murder in Texas state court and sentenced to death. After Horn filed a petition for habeas relief under 28 U.S.C. § 2254 in federal district court, the United States Supreme Court decided *Roper v. Simmons*, 125 S.Ct. 1183 (2005), declaring unconstitutional the execution of those under eighteen at the time of their crime.

The district court stayed Horn's case to allow him to pursue in state court his claim that because he was seventeen years old at the time he committed the murder, his execution would violate the Eighth Amendment's prohibition on cruel and unusual punishment. The Texas Court of Criminal Appeals granted Horn relief and commuted his death sentence to life imprisonment. *Ex parte Horn*, No. 75,262 (Tex. Crim. App. October 5, 2005). The district court then *sua sponte* lifted the stay and denied Horn's petition for habeas relief, but granted Horn a certificate of appealability on his remaining two claims. Because we find that these claims lack merit under the governing standards, we affirm.

## FACTS AND PROCEEDINGS BELOW

On October 13, 1991, eight-year-old Chad Choice (Choice) was reported missing from his home in Tyler, Texas. Choice's older sister told police investigators that her house keys had gone missing the day before; she recalled leaving them by the back door to their residence. Local police interviewed various individuals—including Horn, who was a family friend and who had been at the family's house on October 12th. Finding no evidence of forced entry or struggle, officers initially treated the case as if Choice had run away.

Two days after Choice's disappearance, a ransom note was found at the business of Choice's uncle, Greg Sterling (Sterling), and the investigation immediately shifted to one of kidnapping. The

Sterling family was perceived to be wealthy, although in fact Sterling's business was in poor financial shape. While surveillance of the place of exchange indicated in the ransom note failed to produce any leads, several days later Choice's mother received an anonymous phone call stating that Choice's disappearance was related to a family member's drug debt to a man named Paco. Investigators learned that Sterling owed money to three Colombian drug dealers operating in the area: Paco, Junior, and Carlos.

Efforts to locate Choice were unfruitful. *America's Most Wanted* aired a segment on Choice's disappearance that led to several reports of sightings, but none of these reports led to Choice's discovery. On the first anniversary of Choice's disappearance, a family member found a note under her car's windshield wiper, suggesting that Choice was alive and available for ransom. The note was given to police, but Choice was not located.

On October 10, 1994, FBI agents arrested and incarcerated Horn on unrelated charges that included two federal credit union robberies and a carjacking, in which a victim, James Levassar, was killed. In March 1995, Horn and federal authorities entered into a written plea agreement, signed by Horn and his counsel and the Assistant United States Attorney, in relation to those charges.[1]

---

[1] Notice of this plea agreement was entered on March 24, 1995 on the docket of the federal case.

In exchange for Horn's cooperation, federal authorities agreed not to oppose favorable consideration of Horn at sentencing. The agreement expressly stated, however, that federal authorities would *not* file a motion to reduce Horn's sentence under United States Sentencing Guidelines Manual § 5K1.1.[2] Pursuant to the plea agreement, Horn was to provide all information known to him regarding any criminal activity and was to submit to interviews by both federal and Smith County investigators. The agreement noted that it was distinct from any agreement with state law enforcement and that it could not bind Smith County whose district attorney

---

[2]Horn pleaded guilty to state charges of aggravated robbery in the carjacking matter, resulting in a 35 year sentence. Subsequently, the state prosecutor, desiring Horn's testimony in the state prosecution against one Wells for that *same* carjacking, requested that the federal prosecutor file a 5K1.1 motion on Horn's behalf in Horn's federal case. As a result, the federal prosecutor on October 31, 1995 wrote Horn's federal counsel (Scrappy Holmes) enclosing a proposed revised plea agreement which added a provision for a possible 5K1.1 motion in return for full and complete cooperation. That proposed revised plea agreement was never filed (or noted on the docket) in the federal case, and it is not shown to have been signed by Horn or his counsel.

Section 5K1.1 stated at the time:

"<u>Substantial Assistance to Authorities</u> (Policy Statement)
Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines.
(a) The appropriate reduction shall be determined by the court for reasons stated that may include, but are not limited to, consideration of the following:
    (1) the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;
    (2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;
    (3) the nature and extent of the defendant's assistance;
    (4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance;
    (5) the timeliness of the defendant's assistance." U.S. SENTENCING GUIDELINES MANUAL § 5K1.1 (1994).

4

intended to prosecute Horn for the murder of Levassar.[3]

In a separate agreement with Horn also related to the carjacking, the Smith County district attorney's office agreed that, while it would prosecute Horn for the murder of James Levassar—the victim of the carjacking—in exchange for Horn's cooperation, it would not seek the death penalty.

In late 1995 or early 1996, Horn started hinting to federal authorities that he had information about Choice's disappearance.[4] On October 16, 1995, Sterling's girlfriend discovered a human skull and a note on the doorstep of the residence that she and Sterling shared. A forensic anthropologist later determined that the teeth in the skull suggested the deceased had been around nine years old at the time of death. Several months later, in April of 1996, while Horn was detained on the carjacking charges at the Smith County jail, Horn received a package that included a child's leg bone and a note. On May 24, 1996, upon Horn's defense attorney's consent, the FBI arranged for Choice's mother to confront Horn in his jail cell. Horn, however, did not admit any involvement at that time.

---

[3]In April 1995, after entering into the plea agreement with federal authorities and after pleading guilty, Horn moved to withdraw his plea. His motion was denied.

[4]In October of 1995, Horn spoke with FBI agents regarding Choice's disappearance. He again spoke with the FBI in January of 1996.

On May 31, 1996,[5] Horn was scheduled to be sentenced in federal court for the credit union robberies and carjacking charges. In an *in camera* proceeding on that date, the federal district court judge told Horn that he was aware that authorities thought he might know something about Choice's disappearance and advised Horn to consult with his attorney (Scrappy Holmes) about what he might know and whether he might be able to get immunity. Horn, Horn's defense attorney, and the federal prosecutor were present during the *in camera* proceeding.

Later that day, Horn told the FBI the location of Choice's body. Horn admitted that he had been involved in the drug trade with the three Colombians—Paco, Carlos, and Junior. He stated that he bought drugs from the Colombians and then sold some of those drugs to Sterling. Horn stated that Sterling owed the Colombians a substantial amount of money, and that because of this debt, the Colombians requested that Horn steal the keys to Choice's home. Horn stated that he had done so and had given the keys to Carlos. According to Horn, Paco and Carlos kidnapped Choice in an attempt to collect Sterling's drug debt. Horn claimed that after the Colombians abducted Choice, they picked him up in their car and

___

[5]The TCCA's opinion affirming Horn's conviction and sentence suggests that the date was May 11, 1996. *See Horn v. State*, No. 73,684, at 6 (Tex. Crim. App. Dec. 4, 2002). Horn and respondent Dretke, however, indicate in their briefs on appeal that the pertinent date was, as noted above, May 31, 1996, and the record of the pretrial hearing on Horn's motion to suppress statements made the same day reflects that the correct date is indeed May 31st.

drove him and Choice to an isolated location in East Texas. There, Horn claimed, Paco shot and killed Choice. Also according to Horn, a few days after Choice's abduction and murder, Paco and Carlos arrived at Horn's home and ordered Horn to bury Choice in his backyard. Horn claimed that he did so because he feared losing his own life. Horn led the FBI to the murder scene and the burial site.

On March 31, 1997, Horn was indicted for the capital murder of Chad Choice in Tyler, Smith County, Texas. Horn pleaded not guilty and his case proceeded to trial in the District Court of Smith County, Texas, 241st Judicial District. Horn moved to suppress the statements he made to federal authorities on or shortly after May 31, 1996. After conducting a pretrial evidentiary suppression hearing, the state trial court denied Horn's motion, finding that Horn's statements were made voluntarily. Horn also objected to the admission of testimony through two-way closed-circuit television by state prosecution witness John Birk (Birk), who was terminally ill with cancer and being treated in Ohio. The trial court overruled Horn's objection and allowed the introduction of Birk's testimony by the two-way system. Horn did not testify.

On October 4, 1999, Horn was convicted of the capital murder of Choice—specifically, murder committed in the course of committing kidnapping. TEX. PENAL CODE § 19.03(a). Horn was sentenced to death. TEX. CODE CRIM. PROC. art. 37.071. Judgment was

7

originally entered on October 12, 1999. An amended judgment was signed and entered on March 20, 2000.

An automatic direct appeal to the Texas Court of Criminal Appeals was entered on February 26, 2001. Horn asserted various grounds for relief—including his claims that the trial court should not have allowed prosecutors to introduce Horn's statements made May 31, 1996 or shortly thereafter because they were made involuntarily, and that his confrontation right was violated when the trial court allowed Birk to testify by two-way closed-circuit television. In a some thirty page unpublished opinion, the Texas Court of Criminal Appeals (TCCA) rejected these arguments and affirmed Horn's conviction and sentence. *Horn v. State*, No. 73,684 (Tex. Crim. App. Dec. 4, 2002) (en banc). The United States Supreme Court denied certiorari on October 6, 2003. *Horn v. Texas*, 124 S.Ct. 88 (2003). Horn also filed an application for writ of habeas corpus in state court.[6] The state trial court entered findings of facts and conclusions of law and recommended that relief be denied on December 3, 2002. The TCCA adopted the trial court's findings and conclusions and denied state habeas relief on March 5, 2003. *Ex parte Horn*, No. 54,489-01 (Tex. Crim. App. Mar.

---

[6]Horn did not raise the claims discussed here on collateral review in state court. He fulfilled 28 U.S.C. § 2254's requirement of exhaustion of state remedies by asserting those claims during his trial and on direct appeal to the TCCA. *See Castille v. Peoples*, 109 S.Ct. 1056, 1059 (1989) (noting that once state courts have ruled on a claim, in order to apply for federal habeas relief, a petitioner need not ask for collateral relief in the state court for the same claim decided on direct review).

8

5, 2003) (per curiam) (unpublished).

On October 6, 2004, Horn filed the instant petition for federal habeas relief under 28 U.S.C. § 2254 in the district court below, asserting three grounds for relief: that Horn's Sixth Amendment right to confront his accusers was violated when the state prosecution was allowed to examine Birk, who was in Ohio, by two-way closed-circuit television; that Horn's statements made May 31, 1996 (or shortly thereafter) to federal authorities were involuntary under the Fifth Amendment of the United States Constitution; and that the execution of juvenile offenders is unconstitutional because it violates evolving standards of decency.

After Horn filed his habeas petition in federal court, the United States Supreme Court decided *Roper v. Simmons*, 125 S.Ct. 1183 (2005), holding that "[t]he Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed." 125 S.Ct. at 1200. Accordingly, on June 27, 2005, the federal district court considering Horn's habeas petition stayed Horn's case to allow Horn to exhaust his *Roper v. Simmons* claim in state court. On October 5, 2005, the TCCA, in an unpublished opinion, granted Horn relief on that claim (because he was 17 years old at the time of the offense) and accordingly commuted his death sentence to life imprisonment. *Ex parte Horn*, No. AP-75,262 (Tex. Crim. App. Oct. 5, 2005). On November 8, 2005, the federal district court *sua*

9

*sponte* lifted the stay it had imposed on Horn's federal habeas case and denied relief on Horn's two remaining claims.

On December 6, 2005, Horn filed notice of his intent to appeal. On December 13, 2005, Horn filed a request for a certificate of appealability, as required by 28 U.S.C. § 2253(c)(2). The district court granted Horn's request and issued a certificate of appealability on two claims:

> "1. [Horn] was denied the right to confront witnesses against him because the Court allowed a witness to testify via closed-circuit television;
>
> 2. He was denied due process by the prosecution's promising not to seek the death penalty against him in exchange for his telling them details of his crime, then breaking that promise and using the statements he made."

We address Horn's two claims below.

**DISCUSSION**

**I. STANDARD OF REVIEW**

"In a habeas corpus appeal, we review the district court's findings of fact for clear error and its conclusions of law *de novo*, applying the same standards to the state court's decision as did the district court." *Busby v. Dretke*, 359 F.3d 708, 713 (5th Cir. 2004).

28 U.S.C. section 2254(d) provides:

> "An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. §2254(d) (West 2006).[7]

This court reviews both pure questions of law and mixed questions of law and fact under § 2254(d)(1), while it reviews questions of fact under § 2254(d)(2). *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001). Because Horn's claims for which he has been granted a certificate of appealability involve mixed questions of law and fact, we look to § 2254(d)(1) in our analysis. *See Gochicoa v. Johnson*, 118 F.3d 440, 445 (5th Cir. 1997) (whether defendant's Sixth Amendment confrontation right was violated is a mixed question of law and fact); *Gunsby v. Wainwright*, 596 F.2d 654, 655 (5th Cir. 1979) (voluntariness issue involves mixed questions of law and fact).

Under section 2254(d)(1):

"[T]here are two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim that was adjudicated on the merits in state court: if the state court decision was either 'contrary to . . . clearly established Federal law, as determined by the Supreme Court' or 'involved an unreasonable application of[] clearly established Federal law, as determined by the Supreme Court'." *Martin*, 246 F.3d at 476 (quoting 28 U.S.C. § 2254(d)(1)).

A state court's decision is "contrary to" clearly established

---

[7]The quoted current version of § 2254(d) reflects amendments to § 2254 made by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (AEDPA). Because Horn's federal habeas application was filed after AEDPA's enactment, AEDPA is applicable to it. *See Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001).

federal law within the meaning of the first category of cases eligible for relief under 28 U.S.C. § 2254(d)(1) "if it relies on legal rules that *directly* conflict with prior holdings of the Supreme Court or if it reaches a different conclusion than the Supreme Court on *materially indistinguishable* facts." *Busby*, 359 F.3d at 713 (emphasis added). The Supreme Court has not considered the use of two-way closed-circuit television in relation to the Sixth Amendment, nor has it ruled in a case that was "materially indistinguishable" from Horn's. Thus, the state court decision Horn challenges was not "contrary to" clearly established federal law because "it did *not* apply a rule contradictory to applicable Supreme Court precedent; and it did *not* reach a result, under 'materially indistinguishable' facts, in conflict with such precedent." *Martin*, 246 F.3d at 476. We therefore focus on whether the state court's decision constituted an unreasonable application of Supreme Court precedent to the facts. *See id.*

A state court's decision constitutes an "unreasonable application" of "clearly established Federal law, as determined by the Supreme Court," "'if the state court correctly identifies the governing legal principle from [Supreme Court] decisions but unreasonably applies it to the facts of the particular case.'" *Busby*, 359 F.3d at 713 (quoting *Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002)). "We *cannot* reverse the denial of habeas relief simply by concluding that the state court

12

decision applied clearly established federal law *erroneously*," but rather, "we must conclude that such application was also *unreasonable*." *Martin*, 246 F.3d at 476; *see Neal v. Puckett*, 286 F.3d 230, 233 (5th Cir. 2002) (en banc) (per curiam) (denying habeas relief where state court's conclusion was incorrect but not unreasonable).[8]

Lastly, "we presume that the state court's factual determinations are correct, and we may grant relief only if a factual determination is unreasonable based on the evidence presented to the state court." *Busby*, 359 F.3d at 713 (citing 28 U.S.C. § 2254(d)(2), (e)(1)).

## II. HORN'S SIXTH AMENDMENT CLAIM

As stated in Horn's brief to this court, the essence of his defense at trial was that "the Colombians kidnapped and killed Chad Choice and [that Horn's] involvement in the abduction and murder was the result of duress." To show that Horn's version of events was false, state prosecutors introduced the testimony of three current or former inmates, all of whom testified that Horn had told them that he had killed a young boy. One of these witnesses was

---

[8]In *Neal*, we noted that the United States Supreme Court has emphasized "the critical distinction between an unreasonable application of federal law and a merely 'incorrect' or 'erroneous' application of federal law." 286 F.3d at 236. Accordingly, we concluded that, "Because section 2254(d) 'places a new constraint' on a federal habeas court and demands greater deference to state courts, we have no authority to grant habeas corpus relief simply because we conclude, in our independent judgment, that a state supreme court's application of *Strickland* is erroneous or incorrect." *Id*. (referring to *Strickland v. Washington* , 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).

13

former inmate Birk, who had become acquainted with Horn while both were incarcerated at the Van Zandt County, Texas, jail.

At the time of Horn's trial, Birk was terminally ill and hospitalized in Sylvania, Ohio for liver cancer. He was not expected to improve. His doctor stated that it would be medically unsafe for Birk to travel from Ohio to testify in Texas and strongly recommended against Birk's traveling. Over Horn's Sixth Amendment objections, the trial court permitted Birk to testify from his hospital in Ohio by means of two-way closed-circuit television, with an attorney for the state and counsel for Horn present with Birk as he testified. Horn himself was denied permission to attend, but through the two-way system (utilizing 4x6 foot screens), Horn was able to see Birk as Birk testified, as also could the jury and the court, and Birk, as he testified, was able to see Horn.[9]

Birk testified that Horn had admitted that he "capped a little boy and buried him in his backyard."[10] Birk also stated that Horn

---

[9]It is also indicated, and, there being no evidence or claim to the contrary, we conclude that Birk, as he testified, could also see the jury and the court.

[10]Birk testified:
"Q. [PROSECUTOR] Can you tell this jury in Texas the comments that Mr. Horn made to you?
A. [BIRK] The first story that he told me was that he had told the police some of his friends and himself had buried a little boy in his backyard.
Q. And why did he say he had said that a bunch of his friends and he had done that?
A. He had wanted to come back to Tyler, Texas, or the surrounding area, because he wanted to escape.
Q. That - - was there any discussion by him about the ability to escape from a federal penal institution versus a county jail?

14

admitted to him that he had lied to law enforcement about the Colombians' role in Choice's abduction and murder because he wanted to be transferred from the federal penitentiary to the local county jail where Horn thought he could escape more easily.

In his petition for federal habeas relief, Horn maintains that Birk's testimony violated his Sixth Amendment confrontation right in two ways: first, Horn asserts that the state court violated the Confrontation Clause's literal meaning by allowing Birk to testify in a manner that precluded the type of in-person, face-to-face confrontation contemplated by the Sixth Amendment. Second, Horn claims that because Birk was in Ohio at the time the Texas trial judge administered the oath, Birk was not subject to Texas perjury laws when he testified—an important procedural safeguard guaranteed

---

A.  Yes, sir.  He said the county jails were Mickey Mouse compared to the federal system.
Q.  So he made up the story about his friends so that he could be put in a county jail, which was Mickey Mouse, so he would have a better chance to escape?  Is that your testimony?
A.  Yes, sir.
Q.  Did he - - did he mention on any other occasions the situation involving the little boy that was buried behind his backyard?
A.  Yes, sir.
Q.  Will you tell this jury how that came about and what it is that he said specifically?
. . .
A.  He - - he had told me not to screw him, that he had capped a little boy and buried him in his backyard.
Q.  He had capped - -
A.  And he would have no resolve to doing - - taking care of me.
Q.  Now, he said he had capped a little boy - -
A.  Yes, sir.
Q.  - - and buried him in his backyard?
    In terms of your understanding of that term, what does the term 'capped' mean?
A.  Shot."

15

by the Sixth Amendment.[11]

A. *Testimony via two-way closed-circuit television*

On September 13, 1999, the state moved to allow Birk's examination through closed-circuit television. Horn objected, arguing that the closed-circuit television examination would violate his confrontation right. The state trial court held a hearing outside the jury's presence to discuss the issue, and initially determined that it could not grant the state's request. However, after considering further evidence and conducting a telephone conference with Birk's doctor in Ohio on September 15, 1999, the state court ultimately overruled Horn's objections.[12]

---

[11]The Sixth Amendment states:
"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining Witnesses in his favor, and to have the Assistance of Counsel for his defence." U.S. CONST. amend. VI.
It is made applicable to the states by the Fourteenth Amendment. *Gochicoa*, 118 F.3d at 446.

[12]The trial court stated:
"THE COURT: Okay. This case, very recent case, out of New York, decided January 22nd, 1999, they mentioned, of course, as to extreme exigent circumstances, the record, as a whole, as to the need for the evidence, the procedural safeguards that were implemented.
    I have - - I have some reluctance, but based upon the - - the evidence that's presented here, I'm going to allow the State to move forward, but [sic] two-way closed circuit. And if there is - - I need to have some assurances here about how this is going to happen, because if it can't be done in this way, then we won't do it. Pretty simple.
    There should be a way to split screens so that Mr. Horn is here, and he is always on the screen at one time, and the witness to be interviewed is always on the screen."
The trial court apparently relied at least in part on *United States v. Gigante*, 166 F.3d 75, 81 (2d Cir. 1999), a case in which the Second Circuit held, "Upon a finding of exceptional circumstances . . . a trial court may

16

The state court made clear: "[A]s far as the necessity for - - for this to happen, I'm going to make that finding, that there is a - - there is a particularized need stated by the State and that only in that situation would this be - - would this be done and under the safeguards as provided."

While the United States Supreme Court has not specifically addressed the use of two-way closed-circuit television, two of its decisions concern whether a defendant's confrontation right is violated by a witness testifying in a manner that falls short of in-person, face-to-face confrontation: *Coy v. Iowa*, 108 S.Ct. 2798 (1988), and *Maryland v. Craig*, 110 S.Ct. 3157 (1990). In *Coy v. Iowa*, the defendant-appellant was convicted in Iowa state court of two counts of lascivious acts with a child "after a jury trial in which a screen placed between him and the two complaining witnesses blocked him from their sight." 108 S.Ct. at 2799. The screen used in that case allowed the defendant "dimly to perceive the witnesses," but the witnesses could not see the defendant at all. *Id*. at 2800. The decision to use the screen was based on an Iowa statute that provided for such child witnesses to testify via closed-circuit television or behind a screen. *Id*. at 2799-2800. The defendant argued that the screen's use violated his confrontation right, but the trial court rejected this argument and the Iowa Supreme Court affirmed

allow a witness to testify via two-way closed-circuit television when this furthers the interest of justice."

the defendant's conviction. *Id*. at 2800.

The United States Supreme Court reversed the Iowa Supreme Court, stating that it was "difficult to imagine a more obvious or damaging violation of the defendant's right to a face-to-face encounter" than the use of the screen. *Id*. at 2803. The Court left "for another day, however, the question whether any exceptions exist" to the Confrontation Clause's most literal requirement: that the defendant be able to confront his accuser in person, face-to-face.[13] *Id*. The Court made clear that if such an exception existed, it "would surely be allowed only when necessary to further an important public policy," and "[s]ince there have been no individualized findings that these particular witnesses needed special protection, the judgment here could not be sustained by any

---

[13]The Court stated:
"It is true that we have in the past indicated that rights conferred by the Confrontation Clause are not absolute, and may give way to other important interests. The rights referred to in those cases, however, were not the right narrowly and explicitly set forth in the Clause, but rather rights that are, or were asserted to be, reasonably implicit—namely, the right to cross-examine, see *Chambers v. Mississippi*, 410 U.S. 284, 295, 93 S.Ct. 1038, 1045-1046, 35 L.Ed.2d 297 (1973); the right to exclude out-of-court statements, see *Ohio v. Roberts*, 448 U.S., at 63-65, 100 S.Ct., at 2537-2539; and the asserted right to face-to-face confrontation at some point in the proceedings other than the trial itself, *Kentucky v. Stincer*, *supra*. To hold that our determination of what implications are reasonable must take into account other important interests is not the same as holding that we can identify exceptions, in light of other important interests, to the irreducible literal meaning of the Clause: 'a right to *meet face to face* all those who appear and give evidence *at trial*.' *California v. Green*, 399 U.S., at 175, 90 S.Ct., at 1943-1944 (Harlan, J., concurring) (emphasis added). We leave for another day, however, the question whether any exceptions exist. Whatever they may be, they would surely be allowed only when necessary to further an important public policy. Cf. *Ohio v. Roberts*, *supra*, 448 U.S., at 64, 100 S.Ct., at 2538; *Chambers v. Mississippi*, *supra*, at 295, 93 S.Ct., at 1045-1046." 108 S.Ct. at 2803.

18

conceivable exception."[14]  *Id.*

Two years after *Coy v. Iowa*, the Court decided *Maryland v. Craig*, 110 S.Ct. 3157 (1990).  The defendant-respondent in *Craig* had been convicted in Maryland state court of various offenses, including child abuse and first and second degree sexual offenses. 110 S.Ct. at 3160, 3162.  At trial, the named victim and three other children testified against the defendant by a one-way closed-circuit television procedure provided for by Maryland statute.[15] *Id.* at 3161-62.  The defendant in *Craig* objected that the procedure's use violated her confrontation right, but her objection

---

[14]The Court rejected the state's argument that the statute on which the trial court relied to permit the screen's use provided adequate findings to support an exception to the defendant's confrontation right:
> "The State maintains that such necessity [to further an important public policy] is established here by the statute, which creates a legislatively imposed presumption of trauma.  Our cases suggest, however, that even as to exceptions from the normal implications of the Confrontation Clause, as opposed to its most literal application, something more than the type of generalized finding underlying such a statute is needed when the exception is not 'firmly . . . rooted in our jurisprudence.' *Bourjaily v. United States*, 483 U.S. 171, 183, 107 S.Ct. 2775, 2782, 97 L.Ed. 2d 144 (1987) (citing *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970)).  The exception created by the Iowa statute, which was passed in 1985, could hardly be viewed as firmly rooted. Since there have been no individualized findings that these particular witnesses needed special protection, the judgment here could not be sustained by any conceivable exception."  108 S.Ct. at 2803.

[15]Under the Maryland statutory procedure invoked in *Craig*,
> "[T]he child witness, prosecutor, and defense counsel withdraw to a separate room; the judge, jury, and defendant remain in the courtroom.  The child witness is then examined and cross-examined in the separate room, while a video monitor records and displays the witness' testimony to those in the courtroom.  During this time the witness cannot see the defendant.  The defendant remains in electronic communication with defense counsel, and objections may be made and ruled on as if the witness were testifying in the courtroom."  110 S.Ct. at 3161.

19

was overruled.  *Id.*  Unlike in *Coy v. Iowa*, the trial court in *Craig* "made individualized findings that each of the child witnesses needed special protection."  *Id.* at 3163.  The Court of Appeals of Maryland, however, reversed and remanded for a new trial, determining that while the Confrontation Clause does not *always* require that the defendant be permitted a face-to-face courtroom encounter with an accuser, the state had not made a sufficient showing to invoke the one-way closed-circuit television procedure.  *Id.* at 3162.

The United States Supreme Court vacated the judgment of the Court of Appeals of Maryland and remanded the case.  *Id.* at 3171.  Like the Court of Appeals of Maryland, the Supreme Court rejected the view that the Sixth Amendment uniformly demands in-person, face-to-face confrontation:

> "[A] literal reading of the Confrontation Clause would 'abrogate virtually every hearsay exception, a result long rejected as unintended and too extreme.'  *Roberts*, 448 U.S., at 63, 100 S.Ct., at 2537.  Thus, in certain narrow circumstances, 'competing interests, if 'closely examined,' may warrant dispensing with confrontation at trial.'  *Id.*, at 64, 100 S.Ct., at 2538 . . . .
>      In sum, our precedents establish that 'the Confrontation Clause reflects a *preference* for face-to-face confrontation at trial,' *Roberts*, *supra*, 448 U.S., at 63, 100 S.Ct., at 2537 (emphasis added; footnote omitted), a preference that 'must occasionally give way to considerations of public policy and the necessities of the case,' *Mattox*, *supra*, 156 U.S., at 243, 15 S.Ct., at 339-340."  *Id.* at 3165.

The Court concluded that the "state interest in protecting child witnesses from the trauma of testifying in a child abuse case is

20

sufficiently important to justify the use of a special procedure that permits a child witness in such cases to testify . . . in the absence of face-to-face confrontation." *Id*. at 3169. The Court disagreed with the Court of Appeals of Maryland's holding that the trial court had made insufficient findings to invoke the procedure. *Id*. at 3171. The Court stated, "So long as a trial court makes [] a case-specific finding of necessity, the Confrontation Clause does not prohibit a State from using a one-way closed circuit television procedure for the receipt of testimony by a child witness in a child abuse case." *Id*.

In Horn's case, given the trial court's efforts to confirm Birk's illness and inability to travel and the care with which the other aspects of Horn's confrontation rights were preserved, we cannot say that the decision to permit Birk to testify via two-way closed-circuit television constituted an unreasonable application of established federal law. In *Craig*, the Court determined that "use of the *one-way* closed circuit television procedure, where necessary to further an important state interest, does not impinge upon the truth-seeking or symbolic purposes of the Confrontation Clause." *Id*. at 3167 (emphasis added). The Court emphasized:

> "We find it significant . . . that Maryland's procedure preserves all of the other elements of the confrontation right: The child witness must be competent to testify and must testify under oath; the defendant retains full opportunity for contemporaneous cross-examination; and the judge, jury, and defendant are able to view (albeit by video monitor) the demeanor (and body) of the witness as he or she testifies. Although we are mindful of the

21

many subtle effects face-to-face confrontation may have on an adversary criminal proceeding, the presence of these other elements of confrontation—oath, cross-examination, and observation of the witness' demeanor—adequately ensures that the testimony is both reliable and subject to rigorous adversarial testing in a manner functionally equivalent to that accorded live, in-person testimony." *Id*. at 3166.

The state court presiding over Horn's trial similarly found, after discussing Birk's condition with Birk's doctor, that use of the unorthodox procedure was necessary, and emphasized that other aspects of the Confrontation Clause were maintained:

"THE COURT: Okay. Certainly as to the image that's projected here in the courtroom, as far as any Sixth Amendment right to confront witnesses here in court, the demeanor of the witness appears to be certainly large and able to be viewed very - - very ably by the jury from their location.
     As far as the demeanor, the questions that will be placed before him, his - - his oath that he takes here before the jury, we'll find that that - - that those procedural safeguards are implemented here for the presentation of this witness in these extreme circumstances as - - as we have mentioned before and that this is necessary here."

On direct review, the TCCA also noted the fact that Horn's confrontation right was otherwise safeguarded:

"[T]he closed-circuit television procedure used for Birk's testimony preserved all of the characteristics of in-court testimony: the trial court administered an oath to Birk under the laws of the state of Texas; he was subject to full cross-examination; and he testified in full view of the defendant, jury, court, and defense counsel. In fact, members of both the defense and prosecution teams sat with Birk in Ohio while he testified."[16]

_____

[16]Both the trial court and the TCCA considered *Coy v. Iowa*, *Maryland v. Craig*, and *United States v. Gigante* (*see* note 12, *supra*).

22

Thus, the state court records reflect that a case-specific finding of necessity was made, and that care was taken to preserve other aspects of Horn's confrontation right. Under these circumstances, we cannot say that the determination that it was constitutionally sound to permit Birk to testify by way of the two-way television system constituted an unreasonable application of clearly established federal law as determined by the Supreme Court.

Horn has not pointed to, and our independent search has not found, any post-*Craig* decision by a federal appellate court that squarely states that introduction of testimony through two-way closed-circuit television violates the Confrontation Clause.[17]

---

[17]Since the Court decided *Maryland v. Craig*, circuits have disagreed on the issue of whether *Craig*'s requirement of a specific finding of necessity applies to testimony by two-way closed circuit television as well as to testimony by one-way closed circuit television, the procedure employed in *Craig*. For example, the Eighth and Eleventh Circuits have explicitly concluded that *Craig* governs both types of closed-circuit television testimony. *United States v. Yates*, 438 F.3d 1307, 1313 (11th Cir. 2006) (en banc); *United States v. Bordeaux*, 400 F.3d 548, 555 (8th Cir. 2005). The Second Circuit, however, in at least one case has found that "[b]ecause [the district court] employed a two-way system that preserved the face-to-face confrontation celebrated by *Coy*, it is not necessary to enforce the *Craig* standard [for specific necessity findings] in this case." *Gigante*, 166 F.3d at 81. The Second Circuit noted:

> "The closed-circuit television procedure utilized for [the witness's] testimony preserved all of these characteristics of in-court testimony: [The witness] was sworn; he was subject to full cross-examination; he testified in full view of the jury, court, and defense counsel; and [the witness] gave this testimony under the eye of [the defendant] himself. [The defendant] forfeited none of the constitutional protections of confrontation." 166 F.3d at 80 (footnote omitted).

Horn points out in his brief on appeal that the Eleventh Circuit in its en banc decision in *United States v. Yates*, and the Eighth Circuit in *United States v. Bordeaux*, concluded that testimony via two-way closed-circuit television is "not constitutionally equivalent to a face-to-face confrontation." *Bordeaux*, 400 F.3d at 554. But neither of those courts found that testimony via such a system is *never* constitutional; indeed, *Craig* precludes such a finding.

23

Moreover, other circuits have agreed that introduction of testimony by such means does not constitute an unreasonable application of clearly established federal law as determined by the Supreme Court. *See, e.g.*, *Fuster-Escalona v. Fla. Dep't of Corr.*, 170 F. App'x 627, 629–30 (11th Cir. 2006) (per curiam) (it was "not contrary to, or an unreasonable application of, established federal law to hold that no case-specific findings were required prior to [] four children testifying via two-way closed television"), *cert. denied*, 127 S.Ct. 1251 (2007); *Harrell v. Butterworth*, 251 F.3d 926, 931–32 (11th Cir. 2001) ("Florida Supreme Court's decision—that the witnesses' testimony via two-way, closed-circuit satellite transmission did not violate [defendant's] constitutional rights—was neither contrary to, nor an unreasonable application of, Federal law set forth by Supreme Court cases . . . .").

Horn admits that *Craig* is unfavorable to his position, but he argues that "if *Craig* is not implicitly overruled it is, at the very least, on shaky ground." Horn points out that *Craig* was based in large part on the reliability test in *Ohio v. Roberts*, 100 S.Ct. 2531 (1980), and that *Crawford v. Washington*, 124 S.Ct. 1354 (2004), overruled *Roberts*. Indeed, *Craig* does rely in part on *Roberts*. *See, e.g.*, *Craig*, 110 S.Ct. at 3165 (citing and quoting *Roberts* for the proposition that the Court's "precedents establish that 'the Confrontation Clause reflects a *preference* for face-to-face confrontation at trial'"). *Roberts* instructed "that an

24

unavailable witness's out-of-court statement may be admitted so long as it has adequate indicia of reliability—*i.e.*, falls within a 'firmly rooted hearsay exception' or bears 'particularized guarantees of trustworthiness.'" *Crawford*, 124 S.Ct. at 1359 (quoting *Roberts*, 100 S.Ct. at 2539). And, we agree that *Crawford* overruled *Roberts*.[18] *Whorton v. Bockting*, 127 S.Ct. 1173, 1179 (2007) (". . . we issued our opinion in *Crawford*, in which we overruled *Roberts*"); *see Crawford*, 124 S.Ct. at 1370–74. *Crawford*, however, is inapplicable in this case because it is not retroactive

---

[18]In *Crawford*, the petitioner challenged the trial court's permitting state prosecutors to introduce at his trial his wife's "tape-recorded statements to the police as evidence that the [defendant's] stabbing was not in self-defense." 124 S.Ct. at 1358. The petitioner argued that admission of the evidence violated his Sixth Amendment confrontation right because he had not been given an opportunity for cross-examination. *See id*. at 1356–57. The trial court allowed the prosecutors to introduce the wife's statements after concluding that there were sufficient signs of the type of reliability required by *Roberts*. *Id*. at 1358. The Washington Court of Appeals subsequently reversed the petitioner's conviction, but it was reinstated by the Washington Supreme Court. *Id*. The United States Supreme Court granted certiorari to determine whether the use of the petitioner's wife's statements violated the Confrontation Clause. *Id*. at 1359. The Court concluded that it did, and reversed the judgment of the Washington Supreme Court. *Id*. at 1374 ("In this case, the State admitted Sylvia's testimonial statement against petitioner, despite the fact that he had no opportunity to cross-examine her. That alone is sufficient to make out a violation of the Sixth Amendment."). The Court explained:

> "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does *Roberts*, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether. Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination."
> 124 S.Ct. at 1374.

The Court in *Crawford* declined to set out a "comprehensive definition" of "testimonial." *Id*.

"to cases already final on direct review."[19]  *Bockting*, 127 S.Ct. at 1177.  Moreover, we are not at liberty to presume that *Craig* has been overruled *sub silentio*.  *See State Oil co. v. Khan*, 118 S.Ct. 275, 284 (1997).  Thus, *Craig* governs our analysis of Horn's petition for habeas relief.

Horn also suggests that *Craig* and other cases involving child victims of sexual abuse fall into a unique category where courts sought to protect abused young children from further trauma, and that *Craig*'s reasoning may not be extended to protect other interests. We conclude that it was not unreasonable for the state trial court and the TCCA to disagree.  *Craig*'s references to "an important public policy" and "an important state interest," 110 S.Ct. at 3166, 3167, are reasonably read to suggest a general rule not limited to protecting child victims of sexual offenses from the trauma of testifying in a defendant's presence.  Rather, it is possible to view *Craig* as allowing a necessity-based exception for face-to-face, in-courtroom confrontation where the witness's inability to testify invokes the state's interest in protecting the witness—from trauma in child sexual abuse cases or, as here, from physical danger or suffering.  Other circuits have recognized that protection of seriously ill witnesses may give rise to the type of

---

[19]The TCCA affirmed Horn's conviction and sentence on direct review in 2002, *Horn v. Texas*, No. 73,684 (Tex. Crim. App. Dec. 4, 2002), and the United States Supreme Court denied Horn's petition for writ of certiorari in 2003. *Horn v. Texas*, 124 S.Ct. 88 (2003).  *Crawford* was decided in 2004.

necessity required under *Craig* to permit testimony by way of closed-circuit television. *See, e.g.*, *Yates*, 438 F.3d at 1317 n.10 (acknowledging as a "legitimate reason[] why physical face-to-face confrontation cannot be accommodated" the protection of a witness's "health and safety"); *United States v. Benson*, 79 F. App'x 813, 820–21 (6th Cir. 2003) (defendant's confrontation right was not violated by the district court's decision to permit an 85-year-old witness to testify via video conference from another state when the witness was too ill to travel).  Nor are we persuaded by Horn's observation that while Texas has a statute allowing child witnesses to testify by television, *see* TEX. CODE CRIM. PROC. § 38.071, it does not have a statute providing for such procedure when a witness is ill.  There is no established law that would indicate that before the state may invoke *Craig*, it must be able to point to a *statute* codifying the important state interest it wishes to further.  In light of *Craig*, we hold that the state court's conclusion that it was constitutionally sound for Birk to testify via two-way closed-circuit television was not an unreasonable application of clearly established federal law as determined by the Supreme Court.[20]

---

[20]Justice Breyer's dissenting statement regarding the Supreme Court's decision in 2002 to decline to transmit to Congress the Judicial Conference's proposed Federal Rule of Criminal Procedure 26(b) also supports our conclusion that the state court did not unreasonably apply clearly established federal law as determined by the Supreme Court in this case.  Order of the Supreme Court, 207 F.R.D. 89 (2002).  Proposed Rule 26(b) would have "allow[ed] the use of video transmission whenever the parties are merely unable to take a deposition under Fed. Rule Crim. Proc. 15." 207 F.R.D. at 93.  While Justice Scalia, sharing the majority's view that the proposed rule should not be transmitted to Congress, stated that the proposed rule was "of dubious validity under the Confrontation Clause," *id*., Justice Breyer filed a

27

*B. The Texas court's administration oath to Birk in Ohio*

Another aspect of a defendant's confrontation right is the requirement that a witness make his statements under oath. *See Craig*, 110 S.Ct. at 3163 (stating that "the right guaranteed by the Confrontation Clause includes not only a 'personal examination' . . . but also '[] insures that the witness will give his statements under oath'" (internal citation omitted)). The requirement of testifying under oath impresses the witness "with the seriousness of the matter and guard[s] against the lie by the possibility of a penalty for perjury." *Id*. (quoting *California v. Green*, 90 S.Ct. 1930, 1935 (1970)). "The combined effect of [the] elements of confrontation—physical presence, oath, cross-examination, and observation of demeanor by the trier of fact—serves the purposes of the Confrontation Clause by ensuring that evidence admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo-American criminal proceedings." *Id*.

Birk voluntarily submitted to the jurisdiction of the Texas trial court, stated that he understood that he could be prosecuted

---

dissenting statement joined by Justice O'Connor, in which he noted, "It is not obvious how video testimony could abridge a defendant's Confrontation Clause rights in circumstances where an absent witness' testimony could be admitted in nonvisual form via deposition regardless," *id*. at 96, and "I believe that any constitutional problems will arise, if at all, only in a limited subset of cases." *Id*. at 97.

28

for any perjury, and submitted to Texas perjury laws.[21]  Horn, however, argues that the Texas state trial judge was unauthorized to administer an oath to Birk *in Ohio*, that Birk therefore was not subject to Texas perjury laws, and that consequently Birk's testimony violates "the procedural safeguards insured by the Confrontation Clause guarantee."  When Horn raised the issue on direct appeal, the TCCA stated:

> "Birk voluntarily submitted himself to the jurisdiction of Texas for possible criminal liability for perjury. The jury saw him take the oath to testify truthfully and was informed that the testimony should be considered as if given before it in the courtroom.  The response given to the trial court indicates that Birk believed he was subject to the penalties of the trial court should he perjure himself.  Because the manner of Birk's testimony satisfies the criteria and spirit of the Confrontation Clause, we overrule [this] point of error."

Like the TCCA, we find no merit in Horn's second Sixth Amendment argument for habeas relief; we cannot say that the state court's determination that Birk's oath did not violate Horn's confrontation right constituted an unreasonable application of clearly established federal law.  Indeed, a Texas statute arguably would give Texas jurisdiction to prosecute Birk for perjury had he in

---

[21]The following exchange occurred between Birk and the state trial court:
> "THE COURT: Okay.  As far as submitting to the jurisdiction of the Court here and as to the oath that you would take and any process of – – of the Court here, are you submitting to that voluntarily here under your oath that you have previously taken, Mr. Birk?
> THE WITNESS: Yes, ma'am.
> THE COURT: Okay.  And you understand that you can be prosecuted for any perjury, and it would be aggravated perjury, any kind of perjury count that would be brought against you, you are submitting to that; is that correct?
> THE WITNESS: Yes, ma'am."

fact perjured himself. *See* TEX. PENAL CODE § 1.04.[22] Further, there is no established law from the United States Supreme Court dictating that the administration of the oath to Birk in Ohio violated the Confrontation Clause. Given Birk's voluntary submission to jurisdiction in Texas, we cannot say that it was unreasonable for the state court to conclude that Horn's Sixth Amendment right was not violated.

To be clear, we do not decide whether use of the two-way closed-circuit television or the Texas court's administration of an oath to Birk in Ohio actually violated Horn's confrontation rights.[23] We hold only that the TCCA's conclusion that these procedures did not violate Horn's Sixth Amendment rights was not "contrary to" and did not constitute "an unreasonable application

---

[22]Section 1.04, "Territorial Jurisdiction," of the Texas Penal Code states in part that Texas "has jurisdiction over an offense that a person commits by his own conduct . . . for which he is criminally responsible if: . . . (2) the conduct outside this state constitutes an attempt to commit an offense inside this state ."

Horn has cited no case holding that a prosecution for perjury or like offense under Texas law could not lie against a witness in Birk's position if his testimony had been intentionally false in a material respect. *See, also, e.g.,* 60A Am. Jur.2d, Perjury, § 13 ". . . it is generally considered immaterial whether the person administering the oath is an officer de jure or de facto, if his or her act takes place in the court's presence and by its sanction." *And see*, *United States v. Williams*, 71 S.Ct. 595, 600 (1951) (". . . federal courts . . . uphold charges of perjury despite arguments that the federal court at the trial affected by the perjury could not enter a valid judgment due to lack of diversity jurisdiction, or due to the unconstitutionality of the statute out of which the perjury proceedings arose;" footnotes omitted).

[23]We are aware of no decision (by any court) holding the confrontation clause violated where the court placed the witness under what purported to be a fully binding oath subject to penalties of perjury, and the witness acknowledged it to be such, but it was later determined on appeal (or collateral attack) that the oath was actually not sufficient to subject the witness to perjury prosecution for knowingly giving materially false testimony.

of, clearly established Federal law, as determined by the Supreme

Court of the United States."  28 U.S.C. § 2254(d)(1).[24]

_____

[24]Even if Horn's confrontation right had been violated, that violation would be subject to harmless-error analysis.  *See Coy*, 108 S.Ct. at 2803 ("We have recognized that other types of violations of the Confrontation Clause are subject to that harmless-error analysis, see *e.g., Delaware v. Van Arsdall*, 475 U.S., at 679, 684, 106 S.Ct., at 1436, 1438, and see no reason why denial of face-to-face confrontation should not be treated the same.").  We have previously explained the applicable standard:

> "On direct appeal, when faced with a constitutional violation, a court must reverse the judgment of the court below unless the constitutional error is 'harmless beyond a reasonable doubt.'  *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).  However, in *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), the Supreme Court articulated a 'less onerous' standard for assessing the impact of a state court's constitutional error on collateral review.  Under *Brecht*, a federal court may grant habeas relief on account of constitutional error only if it determines that the constitutional error had a 'substantial and injurious effect or influence in determining the jury's verdict.'  *See id*. at 623, 113 S.Ct. 1710 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).  Under this standard, however, the petitioner should prevail whenever the record is 'so evenly balanced that a conscientious judge is in grave doubt as to the harmlessness of the error.'  *O'Neal v. McAninch*, 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995).  As this court has explained, 'if our minds are 'in virtual equipoise as to the harmlessness' under the *Brecht* standard, of the error, then we must conclude that it was harmful.'  *Woods v. Johnson*, 75 F.3d 1017, 1026–27 (5th Cir. 1996) (quoting *O'Neal*, 513 U.S. at 435, 115 S.Ct. 992)."  *Robertson v. Cain*, 324 F.3d 297, 304–05 (5th Cir. 2003).

The fact that the trial court and the TCCA, on direct review of Horn's case, found only that there had been no constitutional error and did not address whether any such error was harmless, does not preclude our use of the *Brecht* standard.  In a recent case, the United States Supreme Court stated:

> "We hold that in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed. 2d 353, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman*, 386 U.S. 18."  *Fry v. Pliler*, 127 S.Ct. 2321, 2328 (2007).

Accordingly, assuming a confrontation right error, the question we would face is whether that error "had a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Robertson*, 324 F.3d at 307 (quoting *Brecht v. Abrahamson*, 113 S.Ct. 1710, 1722 (1993)).

Because of our holding that the TCCA's determination that the challenged procedures did not violate Horn's confrontation rights was not contrary to, and did not constitute an unreasonable application of, clearly established

31

### III. HORN'S STATEMENT TO FEDERAL OFFICERS

In his second claim for habeas relief, Horn insists that the statement he made to federal officers describing his involvement in Chad Choice's disappearance and murder was involuntary. Horn bases this argument on several assertions, including: his statement was compelled through promises contained in his plea agreement with federal authorities; his will was overborne by the threat of a death sentence; and his will was overborne because of the pressure he received from those in authority to confess. We find no merit in this claim of involuntariness.

"The applicable standard for determining whether a confession is voluntary is whether, taking into consideration the 'totality of the circumstances,' the statement is the product of the accused's 'free and rational' choice." *Rogers*, 906 F.2d at 190 (citing *Martinez v. Estelle*, 612 F.2d 173, 177 (5th Cir. 1980). "A statement is not 'compelled' within the meaning of the Fifth Amendment if an individual 'voluntarily, knowingly and intelligently' waives his constitutional privilege." *Id.* at 190–91 (quoting *Miranda v. Arizona*, 86 S.Ct. 1602, 1612 (1966)).

Before trial, Horn moved to suppress the statements he made to law enforcement authorities after the *in camera* proceeding on May 31, 1996. On August 23, 1999, the state trial court conducted a

---

federal law as determined by the Supreme Court, we do not further address the matter of harmlessness.

32

pretrial motion to suppress hearing, during which state prosecutors presented testimony from the assistant United States attorney handling Horn's sentencing at the time of the May 31, 1996 proceeding; from Horn's lawyer at the time of the May 31, 1996 proceeding; and from the FBI special agent who had primary responsibility for the case of Choice's disappearance. The state trial court carried the motion to suppress forward with the trial. On September 15, 1999, the state trial court denied Horn's motion to suppress:

> "As far as the voluntariness of - - of the actions of Mr. Horn, based upon the - - he was with counsel during the - - in particular the - - the discussions with [the federal district court judge], that record that was obtained from that, he had a full and knowing chance to - - to consult with counsel, his rights were certainly explained to him in some detail from that record.
>     As far as any inducements that may have been made such that would have overcome any free will that he would have exercised in leading authorities, in making *any statements that were* made leading them to the evidence that I know is at issue here, I believe it was *voluntary*. It didn't rise to the level of involuntary action on his part.
>     . . . [T]he motion to suppress is denied." (emphasis added)

On direct review, the TCCA also rejected Horn's contention that his statements to federal authorities on May 31, 1996 were involuntary:

> "[T]he appellant argues that his rights to due process and due course of law were violated when the trial court admitted involuntary statements he made to law enforcement officers that led them to the discovery of the victim's remains. The appellant argues that he struck a plea agreement with federal authorities whereby he would plead guilty to carjacking and credit union robberies, but provide information regarding the

33

whereabouts of Chad Choice in return for consideration on his federal sentence. The appellant's federal defense counsel, a federal prosecutor, and a federal agent testified that *no one offered to recommend consideration for inculpatory information leading to Chad Choice's remains.*
    . . . The record supported the trial court's decision to admit the complained-of statements in the instant case." (emphasis added)

As discussed below, the state trial court's and the TCCA's determination that Horn's statements to law enforcement officials on May 31, 1996 were voluntary, was not contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court.

At the time that Horn disclosed to federal law enforcement officials his involvement in Choice's disappearance, there were no related charges pending against him. In March 1995, Horn had entered into a written plea agreement (signed by Horn and his counsel and the Assistant United States Attorney) with the United States government in which the federal government agreed to "not oppose a reduction in the Defendant's base offense level of three (3) points pursuant to U.S.S.G. Section 3E1.1(b)(2) for acceptance of his responsibility in the charged offense."[25] However, this plea

---

[25]The agreement stated, however, that Horn "understands that the Government WILL NOT be filling [sic] a motion to reduce sentence pursuant to USSG Section 5K1.1 or Fed. R. Crim. P. 35." The agreement further stated:
    "The Defendant agrees to cooperate fully and honestly with the United States Government as well as the Smith County, Texas, District Attorney's Office in the investigation and prosecution of others involved *in the subject matter of this indictment*. The Defendant understands and agrees that complete and truthful cooperation is a material condition of this agreement. Cooperation shall include providing all information known to the Defendant regarding any criminal activity, including but not

agreement and the separate agreement Horn entered into with state authorities were *entirely* unrelated to Choice's kidnapping and murder. As such, Horn's situation is distinguishable from that of the defendant in *Gunsby v. Wainwright*, 596 F.2d 654 (5th Cir. 1979), a case upon which Horn relies. In *Gunsby*, the district court granted habeas relief to the defendant after determining that the defendant's statements were legally involuntary, and we affirmed. 596 F.2d at 655. However, unlike Horn, the statements at issue in *Gunsby* were related to the offense for which the defendant entered into a plea bargain. *See id*. at 658. That is, Gunsby, who had been charged with robbery and had negotiated a plea bargain "whereby he agreed to plead guilty to robbery and testify against two codefendants," made statements by which he incriminated himself in the charged robbery. *Id*. at 655. Rather than being sentenced to the seven years and six months that his plea agreement stated would be the maximum sentence, the plea bargain was set aside, his statements were used against him, and he "was convicted of robbery and given a 20-year sentence." *Id*. In this case, Horn's statements regarding his involvement in Choice's disappearance were unrelated to the charges then pending against

_____

limited to the offenses described in this agreement. . . . The United States Government agrees that any statements made by the Defendant during the cooperation phase of this agreement shall not be used against the Defendant in any subsequent prosecutions, unless and until there is a determination by the Court that the Defendant has breached this agreement, or for purposes of impeachment." (emphasis added)

35

him and to the subject matter of the plea agreements he had with federal and state authorities.

The fact that Horn's existing plea agreements were wholly unrelated to Choice's abduction and murder also distinguishes this case from *United States v. Rogers*, 906 F.2d 189 (5th Cir. 1990), a federal criminal prosecution, another case that Horn relies on heavily. In *Rogers*, this court affirmed the district court's grant of the defendant's motion to suppress, determining that the defendant's confession was involuntary under the circumstances. 906 F.2d at 191. However, unlike in Horn's case, in *Rogers* the defendant made statements inside the local sheriff's office to federal officials regarding stolen guns—the *same subject* for which local law enforcement officers had specifically promised him he would not be charged if he cooperated.[26] *Id*. at 190. Under those circumstances, it was reasonable for the defendant to conclude that this "questioning [by federal officers] was related to the original investigation and promise by the Sheriff's Office." *Id*. at 191.

---

[26]The details of *Rogers* are as follows: Law enforcement officials from a local sheriff's department interviewed the defendant regarding some stolen guns. 906 F.2d at 190. The defendant cooperated after officials told him that he would not be charged if he helped them. *Id*. Later, the defendant was asked to go down to the sheriff's office to speak with someone regarding the guns. *Id*. After he arrived, he spoke with two federal officers. *Id*. at 192. When his statements to the federal officers led to a three-count indictment related to the firearms, the defendant moved to suppress. *Id*. at 190. In affirming the decision to grant the motion, we explained: "Because the interview was conducted under the auspices of the Lee County Sheriff's Department, whose representatives had assured [the defendant] that he would not be prosecuted for his purchase of the stolen guns, [the defendant's] statement was not 'voluntary' for purposes of the Fifth Amendment." *Id*. at 192.

36

The same cannot be said of Horn's statements to officials regarding Choice's murder.

Further, Horn's plea agreement with federal authorities specifically spelled out that it did *not* bind state authorities:

> "The Defendant understands that the Smith County, Texas, District Attorney's Office is also going to prosecute him for his role in the subject matter of this Indictment which includes the murder of James Clark Levassar. The Smith County, Texas, District Attorney's Office has agreed not to seek the death penalty in return for his plea of guilty and cooperation. Additionally, they have agreed that any sentence of imprisonment the Defendant receives in state court on related charges will run concurrently with the sentence of imprisonment he receives in federal court. . . . The Defendant understands that his agreement with the Smith County District Attorney's Office is distinct from this agreement. The Defendant understands that the United States of America and the United States District Court cannot bind the Smith County, Texas, District Attorney's Office regarding this matter."

We also reject Horn's contention that his will was overborne by pressure to confess placed on him by authorities. During the May 31, 1996 *in camera* proceeding, the federal district court judge specifically encouraged Horn to discuss with his attorney the pros and cons of disclosing information to the authorities. The substance of the *in camera* proceeding was as follows:

> "THE COURT: . . . Mr. Horn, I'm going to suggest to you that you not say one word during this proceeding.
> MR. HORN: Yes, sir.
> THE COURT: Just have nothing whatever to say. I just want to make some statements to you. The attorneys have outlined to me what your present situation is. From my past dealings with you, I have perceived that you are a person of high intelligence and you understand what goes on. I think you understand what your situation is now.
> As you know, the Court is bound by the Sentencing

37

Guidelines unless there is a motion for downward departure from the Government. I think you know that.

MR. HORN: Yes, sir.

THE COURT: Nothing I can do. It is just up to whether the Government files that motion. I am told that you have indicated, without telling any details, that you may know something about the disappearance of a young man by the name of Chad Choice. Whether that is so, I don't know. I am not– I am saying to you that you face a bleak prospect if you don't do something.

I am not going to advise you what to do. You are a free spirit. You can do what you want to do. But you have an extraordinarily good lawyer. He is one [of] the best lawyers that I know of in Texas. I have always found him to be completely dependable. If he tells me something that is going to happen, that is the way it is going to be. Any communication that he has with you is absolutely secret. It cannot be divulged.

In other words, what you tell him is between you and him and no one else. And no one can ever call him aside and say, 'Tell us what he said.' If he did that, he could – if he did say what you said, he could be disbarred and never again practice law.

I am told by the Government that they would be willing to file a motion under 5K1 to depart downward from your – – what is presently projected as your sentence if you were to reveal the details of this Chad Choice disappearance, anything that you might know.

I'm not going to advise you what to do, but I have got a suggestion. *My suggestion to you is that you tell anything you know to your lawyer. If he thinks that there is any way that he could cut a deal with these state authorities* based on what you know, *he might be able to get immunity over there. I said "might."* I don't know. That would have to be a matter that they decided between themselves. But if you were to do that, the attorney for the Government has told me on the record here – – isn't that right,. . .?

[GOVERNMENT ATTORNEY]: That's correct.

THE COURT: – – that he would file a 5K1 departure motion. *Now, if you were to tell your attorney the full details and it wasn't to your credit, there would be no way he could get anything for you, I think he would tell you that. And you still haven't lost anything because he is not going to to tell it.* He can't. That is the law. And he will also tell you whether he thinks he can make a deal for you with the state. I just wanted to tell you this on the record. This is all being taken down.

38

> I am not, I emphasize to you, I am not giving you advice. I am just telling you what the possibilities are because I think you need to know." (emphasis added)

This record makes clear that, rather than putting insurmountable pressure on Horn to confess to his involvement in Choice's disappearance, the district court judge encouraged Horn to consult with his attorney *before* discussing any knowledge with law enforcement officials.

While it is true that "a confession given as the result of a direct or implied promise would be legally involuntary," *Gunsby*, 596 F.2d at 656, the circumstances surrounding Horn's confession to his involvement in Choice's disappearance and murder cannot be said to be the result of any such promise. Horn was clearly advised by the federal district court judge to consult with his attorney regarding the *possibility* of reaching some sort of agreement. The plea agreements he had entered into at the time were wholly *unrelated* to Choice's abduction and murder, and there was never any promise that Horn would be immune from prosecution in relation to Choice's disappearance. The findings of the state trial court and the TCCA that Horn's statements were knowing and voluntary, that his free will was not overcome, and that no one offered to recommend consideration for inculpatory information regarding Choice, are reasonably supported by the record. Admission of Horn's statements to the FBI, and the evidence discovered as a result (Choice's remains), was not contrary to and did not

39

constitute an unreasonable application of clearly established federal law as determined by the Supreme Court.

## CONCLUSION

Because we find that the state court did not unreasonably apply established federal law as determined by the United States Supreme Court, we affirm the district court's judgment denying Horn's petition for habeas corpus.

AFFIRMED

40