# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00086-CR

**Juan Martin Lopez, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF HAYS COUNTY, 22ND JUDICIAL DISTRICT
### NO. CR04-780, HONORABLE WILLIAM HENRY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant Juan Martin Lopez was convicted of sexually abusing two of his wife's children by an earlier marriage, J.U. and D.U., and his two biological daughters, T.L. and A.L. At the time of trial in early 2006, his stepson J.U. was 13, his stepdaughter D.U. was 12, T.L. was 7, and A.L. was 6. J.U. and D.U. were alleged to have been abused some time between June 1998 and July 2003. T.L. and A.L. were alleged to have been abused some time between August 1999, just after A.L.'s birth, and July 2003. Appellant was accused of penetrating J.U.'s anus with his sexual organ (Count I), penetrating A.L.'s mouth with his sexual organ (Count II) and her sexual organ with his finger (Count III), contacting and penetrating T.L.'s sexual organ with his sexual organ (Count IV), and touching D.U.'s genitals with his genitals (Count V). *See* Tex. Penal Code Ann. § 21.11 (West 2003) (indecency by contact), § 22.021 (West Supp. 2008) (aggravated sexual assault). All four victims testified at trial; the youngest two children testified by closed-circuit

television. The jury convicted him on all counts and sentenced him to four terms of eighty years' imprisonment and one twenty-year term, all to be served consecutively. On appeal, he contends that article 38.071 of the code of criminal procedure is unconstitutional, that the evidence is legally insufficient to support the convictions, and that his sentences were excessive and disproportionate to the offenses for which he was convicted. We affirm the judgments of conviction.

**Testimony by closed-circuit television**

In his first point of error, appellant complains that article 38.071, which provides that a child witness younger than thirteen may testify through closed-circuit television rather than in the courtroom and in front of the defendant, is unconstitutional because it violated his right to confront witnesses against him. *See* Tex. Code Crim. Proc. Ann. art. 38.071, §§ 1, 3 (West Supp. 2008).

T.L. and A.L. were permitted to testify via closed-circuit television rather than in appellant's presence. At the time of trial, T.L. was seven years' old and A.L. was six. The abuse was alleged to have occurred from the time T.L. was about one until she was five, and from some time after A.L.'s birth until she was nearly four. At a pretrial hearing on whether to allow closed-circuit testimony, the State called the girls' three therapists and the girls' former foster mother, with whom they lived from September 2003 until mid-2005, about six months before trial.

Claudia Brown, a licensed professional counselor who primarily works with sexually abused children, worked with both T.L. and A.L. from September 2003 until September 2004. She testified at the hearing that T.L. told her that appellant had beaten T.L. with a belt, tied her up, taped her mouth shut, touched her on her breasts and genitals, and "poked her with what she called 'it,'" and that T.L. saw appellant "humping" on D.U. and on top of A.L. A.L. similarly told Brown that

2

appellant tied A.L. up, choked her, threatened her with a knife, played with her private parts, poked her with his penis, and "taught [T.L.] how to do sex." Brown believed closed-circuit testimony was necessary to protect the girls' welfare because both children are "very afraid of him." Brown believed it would be "very traumatic" for T.L. and A.L. to face their father in court while they testified and did not think that T.L. "would be able to speak the truth or say what she felt or what happened to her in front of him," or that A.L. "would be able to speak." Brown testified that T.L.'s and A.L.'s emotional distress in appellant's presence would go beyond mere nervousness, excitement, or reluctance to testify. She thought that having to see him in court would "cause all the trauma to come back up" and "undo all the work that the three of us therapists have tried to do."

Stephanie Casey, a therapist who treated the girls from October 2004 until July 2005, believed a closed-circuit procedure was necessary to protect the girls because they were "fragile." She thought facing their father would be harmful and "could retraumatize them in that it could bring back a flood of memories; they may be unable to speak; they might be upset, fearful, a variety of things." Casey did not think the girls had seen appellant since being removed from the home and thought "revisiting that would traumatize them." She thought they would be more than merely nervous, excited, or reluctant to testify because appellant is their father and because "they're just little girls. About all I can say is that because of their age; emotional maturity; development; and coming to a courtroom, which is not their usual place; or facing the alleged perpetrator."

Elaine Brandon, the therapist who had been working with the girls since August 2005, testified that she also thought closed-circuit testimony was necessary to protect the girls because, "[b]ased on the change in their behavior and their interactions during therapy over the last month,

3

it indicates that in preparation for this trial that they've already begun to show distress and hav[e] difficulties being able to deal with the situation again." She believed A.L. and T.L. would be traumatized if they had to testify in appellant's presence "[b]ecause of the abuse from the past. It has not been that long and posttraumatic stress disorder can come up at any time. And one of the diagnostic criteria for that is reliving the situation, having it come back up; therefore, having to face their father again would do that." She thought that the girls' emotional distress if required to testify in appellant's presence would go beyond nervousness, excitement, or reluctance to testify.

Bonnie Hinkston, the girls' former foster mother, testified about the girls' time with her and their allegations against appellant. She said that when they were scheduled to visit their biological mother, they "were always afraid that they were going to see" appellant. She thought that allowing the children to testify through closed-circuit television was necessary to protect their welfare "[b]ecause of their fear of him" and because T.L. "has been diagnosed with an expressive language disorder . . . . And when she's put in a place where she's under stress, she just totally shuts down. I don't think that she could sit here and testify with him sitting in the room. I think she would totally shut down and would be—well, posttraumatic stress syndrome would come again." She believed that T.L. and A.L. would be traumatized if they had to testify in front of appellant and that their emotional distress would go beyond mere nervousness, excitement or reluctance to testify.

Appellant called Dr. Michael Scott McNeil,[1] a psychologist who testified that Hinkston's testimony "raise[d] red flags" for him because he thought she was mistaking the girls'

---

[1] In the reporter's record, Dr. McNeil's name is spelled "McNiel," and in the trial court's orders, it is spelled "McNeal." Invoices and a letter provided by the doctor spell his name "McNeil." We will use the spelling that the doctor himself uses.

general nervousness about testifying as instead being fear of seeing appellant in court. He also testified that he thought the therapists were "vague in relaying psychological symptoms" and that one of them erroneously used a test intended for use on adults to diagnose T.L. In reviewing the children's records, McNeil did not see "anything that would make me say, 'Well, yeah, this is evidence of the trauma or symptoms related to posttraumatic stress disorder or nothing else.'" He testified that in general, children and adults alike reacted to "the stresses of the courtroom," and that studies had been conducted to monitor for "retraumatization" from courtroom exposure to a perpetrator, which found that although there was a "possibility" that a victim might "flip out when they get to the courtroom and they confront their accuser," "there's not much to that." He referred to an article that concluded that there was little evidence to support the widespread belief in the therapeutic community that a victim would be "retraumatized" by the perpetrator's trial, *see* Ulrich Orth & Andreas Maercker, *Do Trials of Perpetrators Retraumatize Crime Victims*, 19 J. Interpersonal Violence, Feb. 2004, at 212,[2] and stated that the research relied on by *Maryland v. Craig*, 497 U.S. 836 (1990), which upheld similar provisions protecting child witnesses from testifying in front of their alleged abusers, had been "savagely" criticized. McNeil admitted that he had not spoken to the girls and could not say whether they would be traumatized by seeing their father in court or whether it was in their best interest to testify outside of appellant's presence.

---

[2] The article states, "It is not a matter of controversy that attendance at trials of perpetrators frequently leads to severe psychological stress among crime victims." Ulrich Orth & Andreas Maercker, *Do Trials of Perpetrators Retraumatize Crime Victims*, 19 J. Interpersonal Violence, Feb. 2004, at 212, 213. However, "occasionally it is stated that trials could be retraumatizing for the crime victims," and the authors found in their studies little empirical evidence to support the "retraumatizing" theory, which they assert "should be used with caution." *Id.* at 213, 225.

He said he did not believe that "children should always have to come in and testify" before their alleged abuser, and he thought that "[i]f you can demonstrate the likelihood of trauma," it would be inappropriate to require a child to testify in the presence of the accused. He could not say whether he disagreed with the witnesses' opinions that the girls would be traumatized by testifying in front of appellant, saying "there's not enough information" to evaluate those opinions. The trial court overruled appellant's objections and granted the State's motion.

Appellant contends that "a growing body of research now indicates that testifying in the presence of one's abuser is not as harmful to children as was thought at the time" the Supreme Court decided *Craig*. Because the compelling State interest on which *Craig* was based is "no longer valid," he argues, article 38.071 violates his constitutional confrontation rights. He further argues that the statute is unconstitutional under the Supreme Court's opinion in *Crawford v. Washington*, 541 U.S. 36 (2004). Finally, he argues that McNeil's expert testimony about whether the children displayed symptoms of trauma and could not testify in appellant's presence "was unrefuted by the State" and, therefore, "should be accorded a substantial amount of weight" in our determinations.[3]

In *Craig*, the Supreme Court held that a child victim's well-being may outweigh a defendant's right to confront his accuser face-to-face. 497 U.S. at 853. The Court said that "face-to-face confrontation enhances the accuracy of factfinding by reducing the risk that a witness will wrongfully implicate an innocent person" but is not required in every case. *Id*. at 846-47. The Court observed that Maryland's procedure prevented the child from seeing the defendant as she testified

---

[3] Appellant also asserts that article 38.071 is premised on an improper assumption that a defendant is guilty of the alleged abuse. This argument has been decided contrary to appellant's position. *Marx v. State*, 987 S.W.2d 577, 581-82 (Tex. Crim. App. 1999).

6

but otherwise "preserve[d] all of the other elements of the confrontation right," including requiring that the child be competent to testify, sworn as a witness, and subjected to cross-examination. *Id.* at 851. The Court held that the procedure "not only permit[s] a defendant to 'confound and undo the false accuser, or reveal the child coached by a malevolent adult,' but may well aid a defendant in eliciting favorable testimony from the child witness." *Id.* (quoting *Coy v. Iowa*, 487 U.S. 1012, 1020 (1988)). The Court noted a "growing body of academic literature documenting the psychological trauma suffered by child abuse victims who must testify in court" and said that it would not second-guess the Maryland legislature's determination about how best to protect child victims from emotional trauma when testifying about their abuse. *Id.* at 855. The Court held that "a State's interest in the physical and psychological well-being of child abuse victims may be sufficiently important to outweigh, at least in some cases, a defendant's right to face his or her accusers in court," and that, under the proper circumstances, a closed-circuit television procedure for child witnesses does not "impinge upon" a defendant's rights under the Confrontation Clause. *Id*. at 852-53. Whether to allow a closed-circuit procedure must be made on a case-by-case basis to determine whether a particular child needs that protection. *Id.* at 855. We review that decision for an abuse of discretion. *Barnes v. State*, 165 S.W.3d 75, 84 (Tex. App.—Austin 2005, no pet.).

On appeal, appellant cites to several papers concerning the welfare of child witnesses. However, appellant did not introduce those studies before the trial court,[4] and we will not consider evidence that was not presented to the trial court. *See Rangel v. State*, 250 S.W.3d 96, 98

---

[4] Appellant only introduced into evidence the article discussed earlier authored by Orth and Maercker, 19 J. Interpersonal Violence, at 212. He does not cite that article on appeal.

7

(Tex. Crim. App. 2008) (dismissing petitions for review as improvidently granted and stating, "We refuse to examine the propriety of a trial judge's ruling based on evidence that the trial judge had no opportunity to consider when he made his ruling."). "Once a scientific principle is generally accepted in the pertinent professional community and has been accepted in a sufficient number of trial courts through adversarial *Daubert/Kelly*[5] hearings, subsequent courts may take judicial notice of the scientific validity (or invalidity) of that scientific theory based upon the process, materials, and evidence produced in those prior hearings." *Hernandez v. State*, 116 S.W.3d 26, 29 (Tex. Crim. App. 2003). McNeil himself stated that there is a long-held theory in the therapeutic community that a victim of crime, especially a child, may be traumatized or "retraumatized" by having to testify in the alleged perpetrator's presence, although he asserted that recent studies have not found evidence to support that theory. The only article introduced into evidence states that it was accepted that a victim will frequently suffer "severe psychological stress" in the trial of the alleged perpetrator. Orth & Maercker, 19 J. Interpersonal Violence, at 213. The other articles to which appellant cites on appeal should have been given to the trial court for consideration: "The trial court hearing is the main event for *Daubert/Kelly* gatekeeping hearings; it is not a try-out on the road to an appellate scientific seminar." *Hernandez*, 116 S.W.3d at 30. We overrule appellant's first issue as far as it relies on studies not presented to the trial court, and we hold that the trial court did not err in determining that *Craig* was still valid in light of McNeil's testimony and the single study produced at the hearing.

---

[5] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993); *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992).

We next consider appellant's argument that McNeil's testimony showed that the children would not be harmed by testifying in the same room as appellant. McNeil testified that he was concerned by the evidence relied on and methodology used by the therapists in concluding that the girls would be harmed by testifying in appellant's presence. However, he also said he had not spoken to the girls and could not testify about whether they would be harmed. Although McNeil's testimony may have cast some doubt on the therapists' testimony, it was not such that it utterly invalidated the State's witnesses' testimony. Three experienced therapists who had worked with the two children over a period of more than two years testified that the girls were very frightened of their father and that they would be traumatized and perhaps even unable to speak if forced to testify in his presence. The girls' former foster mother provided lay testimony to the same effect. It was for the trial court to consider the competing evidence about how to handle these child witnesses and to weigh the State's evidence about the children and the possible harm they might suffer. *See Barnes*, 165 S.W.3d at 84-85. The trial court did not err in finding that the children would likely be harmed if required to testify in the same room with appellant.

As for appellant's argument that the Supreme Court's opinion in *Crawford* somehow invalidates article 38.071, we disagree. In *Crawford*, the Court discussed a criminal defendant's right to confront witnesses against him, noting that the Confrontation Clause should be interpreted with a focus on avoiding the use of ex parte examinations as evidence in a criminal trial. 541 U.S. at 50. The Court overruled its reasoning in *Ohio v. Roberts*, 448 U.S. 56 (1980), emphasizing that availability and cross-examination, not the presence of indicia of reliability, are the central foci in determining when a testimonial statement should be allowed into evidence. 541 U.S. at 68-69. This

9

does not, however, require a conclusion that, upon a proper showing of probable harm, allowing a child witness to testify via closed-circuit television amounts to a Confrontation Clause violation. The girls testified from a conference room with their foster mother, the judge, and attorneys for the State and appellant present, they were asked about the difference between truth and lies, and the jury was able to observe them as they testified. Appellant's attorney was permitted to cross-examine the girls, to have appellant and Dr. McNeil on the phone during questioning, and to pause questioning to confer with appellant throughout his examinations. *See Marx v. State*, 987 S.W.2d 577, 580 (Tex. Crim. App. 1999) (reliability of child's testimony may be assured without face-to-face encounter through "combined effect of the witness' testimony under oath (or other admonishment, appropriate to the child's age and maturity, to testify truthfully), subject to cross-examination, and the factfinder's ability to observe the witness' demeanor, even if only on a video monitor").

*Crawford*'s holding that confrontation is the key to the admissibility of testimony does not overrule the Court's earlier statements that actual face-to-face confrontation is not indispensable or required in "*every* instance in which testimony is admitted against a defendant." *Craig*, 497 U.S. at 847. In this case, the testimony was given before the trial judge and two attorneys, and appellant was given the opportunity to cross-examine the girls. Thus, the trial court presumably found that the State satisfied its burden of showing probable harm to the children, and appellant's confrontation rights were sufficiently preserved by the closed-circuit procedure. It is not for us to reconsider *Craig* or "to presume that *Craig* has been overruled *sub silentio*." *Horn v. Quarterman*, 508 F.3d 306, 319 (5th Cir. 2007), *cert. denied*, 128 S. Ct. 2084 (2008) (terminally

10

ill witness testified via two-way television). We overrule appellant's challenge to the constitutionality of article 38.071 and hold that the trial court did not err in allowing the procedure.

## Sufficiency of the evidence

In his second point of error, appellant argues that the evidence is legally insufficient to support the jury's guilty verdicts on counts II, III, and IV (the aggravated sexual assaults of A.L. and T.L.). He bases his attacks on his assertion that the evidence showed that A.L. and T.L. were "helped" in their recollections by Hinkston, their former foster mother.

The evidence on which appellant relies to show that T.L.'s and A.L.'s testimony was coached and unreliable is:

- T.L.'s statement that Hinkston talked to T.L. about the alleged abuse, "remind[ed T.L.] about those things," and "helped [T.L.] remember" some of the allegations;

- A.L.'s agreement when asked whether Hinkston had asked "questions about what happened" and told A.L. "what happened," and her testimony that Hinkston "didn't say anything" or "tell [A.L.] anything," that Hinkston "remind[ed A.L.] of a couple of stuff," and that Hinkston would be lying if she said she had not reminded A.L. about anything;

- Hinkston's testimony that the girls wanted to stay with her but knew they would be adopted by someone else, that they knew Hinkston was not going to adopt them, and that she "never indicated [she] was" going to adopt them; and

- T.L.'s testimony that she wanted to be adopted by Hinkston, that she talked to Hinkston "a lot" about being adopted by her, and that Hinkston would be lying if "she were to say that she never talked to [T.L.] about adopting" the girls.

Appellant argues that the described testimony shows that Hinkston coached the girls and was untruthful in her own testimony and thus renders the evidence legally insufficient to support the convictions in Counts II, III, and IV. We disagree.

11

Viewing the evidence in the light most favorable to the jury's verdict, we ask whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Hampton v. State*, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005); *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000). "Although our analysis considers all evidence presented at trial, we may not re-weigh the evidence and substitute our judgment for that of the jury." *King*, 29 S.W.3d at 562. Appellant's argument focuses on whether A.L.'s and T.L.'s testimony should be believed. This is an attack on the credibility of the witnesses and the weight to be given their testimony. *See West v. State*, 121 S.W.3d 95, 111-13 (Tex. App.—Fort Worth 2003, pet. ref'd) (defendant argued child had motive to fabricate accusations; court held that child's testimony was legally sufficient evidence and that, even considering evidence of possible motive, evidence was factually sufficient); *Lange v. State*, 57 S.W.3d 458, 465 (Tex. App.—Amarillo 2001, pet. ref'd) (there was evidence from which jury could have believed that defendant's ex-wife had manipulated daughter into making accusations, but also sufficient evidence from which jury could have found appellant guilty; "While there were some conflicts in complainant's repeated telling of the incidents and in the medical evidence, as well as psychological testimony indicating appellant did not have tendencies to molest children, those conflicts and the credibility of the witnesses were well within the province of the jury to resolve, and its findings were not so contrary to the overwhelming weight of the evidence as to be wrong and unjust."); *Murray v. State*, 24 S.W.3d 881, 885-87 (Tex. App.—Waco 2000, pet. ref'd) (evidence sufficient despite evidentiary inconsistencies; argument that child was "obviously coached" considered as factual-sufficiency issue); *see also Quinton v. State*, 56 S.W.3d 633, 639 (Tex. App.—Waco 2001, pet. ref'd) (in considering credibility of child's recanting of accusations,

12

"The trial court was in a position to judge [the child's] demeanor both at trial and at the hearing. Based on the record, we cannot say he abused his discretion in finding the recantation incredible.").

We have considered the entire record, including the complained-of testimony, and hold that the evidence is legally sufficient to support the jury's guilty verdicts on all five counts. We overrule appellant's second point of error.

## Sentencing

In his third point of error, appellant argues that the jury's sentences violate his constitutional protection against excessive and disproportionate punishment. He argues that the sentences, which are to run consecutively, are "disproportionate to the offenses of which he was convicted and excessive in light of the range of sentences received by other defendants convicted of similar crimes." He asks us to consider that he "has never engaged in, or been accused of engaging in, the type of behavior alleged in his indictment" and, "even if the allegations are accepted as true, the events as alleged . . . were isolated instances of conduct" that "did not span over a period of years and were not alleged to have occurred with any degree of frequency." Finally, he contends that the children were encouraged by "well-meaning but overzealous counselors" to recount their allegations, "with no regard to whether the incidents in question actually occurred" and "asks that this Court consider these factors before it undertakes any proportionality analysis."

To preserve alleged error related to excessive punishment, a defendant must have made a timely request, objection, or motion at the trial court. Tex. R. App. P. 33.1(a)(1); *Castaneda v. State*, 135 S.W.3d 719, 723 (Tex. App.—Dallas 2003, no pet.). After sentencing, appellant did not object to the sentences other than to ask that they not be stacked, nor did he raise the argument in a post-trial motion. Thus, appellant has not preserved this issue for our review.

13

Even if he had preserved error, however, his argument fails. The punishment range for aggravated sexual assault is life imprisonment or a term between five and ninety-nine years. Tex. Penal Code Ann. § 12.32(a) (West 2003). The range for indecency by contact is between two and twenty years. *Id*. § 12.33(a) (West 2003). When the victim of aggravated sexual assault is younger than six or if certain aggravating factors are present, the defendant must be sentenced to at least twenty-five years. *Id.* § 22.021(f). If the defendant is convicted of multiple offenses arising out of the same "criminal episode," defined as multiple offenses committed during the same transaction or multiple connected transactions or if "the offenses are the repeated commission of the same or similar offenses," *id.* § 3.01 (West 2003), and the convictions are for particular offenses, including indecency with a child or aggravated sexual assault of a child, the sentences may run concurrently or consecutively. *Id.* § 3.03(b)(2) (West Supp. 2008). As a general rule, punishment within the statutory range is not unconstitutionally cruel and unusual. *See, e.g.*, *Jordan v. State*, 495 S.W.2d 949, 952 (Tex. Crim. App. 1973); *Winchester v. State*, 246 S.W.3d 386, 388 (Tex. App.—Amarillo 2008, pet. ref'd); *Willis v. State*, 192 S.W.3d 585, 596 (Tex. App.—Tyler 2006, pet. ref'd); *Jagaroo v. State*, 180 S.W.3d 793, 802 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd).

As discussed, it was for the jury to determine whether the children were coached or led into making false or even exaggerated accusations. We will not second-guess that decision and will consider the appropriateness of the sentences in light of the jury's finding of guilt. As far as appellant's contention that the abuse was "isolated" and did not occur "with any degree of frequency," D.U. testified about several instances of abuse, J.U. testified about two specific instances, and T.L. and A.L. testified about repeated acts of abuse; J.U. was the only victim who

14

testified with any specificity about the abuse. Further, even if the abuse had only occurred one time to each child, the fact that appellant subjected four young children to serious sexual abuse would be sufficient to support punishment within the range prescribed by statute. Appellant makes no showing that an eighty-year sentence is somehow "grossly disproportional" to the gravity of the offense of aggravated sexual assault of a young child, especially when the repeated nature of at least some of the abuse is considered, as well as the age of the victims and the fact that there were four victims in all. And, even if appellant had made that showing, he has not presented any comparisons to sentences imposed on other criminal defendants in the jurisdiction or to sentences imposed for similar conduct in other jurisdictions. *See Willis*, 192 S.W.3d at 596 (if sentence is "grossly disproportionate" to gravity of crime and prior convictions, court next compares it to sentences imposed on other defendants in same jurisdiction and those imposed for same offense in other jurisdictions). Nor has he shown that the trial court acted improperly in stacking the sentences consecutively. We overrule appellant's third and final point of error.

### Conclusion

Having overruled appellant's points of error, we affirm the judgments of conviction.

_____

David Puryear, Justice

Before Chief Justice Law, Justices Puryear and Henson

Affirmed

Filed: December 31, 2008

Do Not Publish

15