TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-06-00086-CR






Juan Martin Lopez, Appellant


v.


The State of Texas, Appellee






FROM THE DISTRICT COURT OF HAYS COUNTY, 22ND JUDICIAL DISTRICT

NO. CR04-780, HONORABLE WILLIAM HENRY, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N


 Appellant Juan Martin Lopez was convicted of sexually abusing two of his wife's
children by an earlier marriage, J.U. and D.U., and his two biological daughters, T.L. and A.L. At
the time of trial in early 2006, his stepson J.U. was 13, his stepdaughter D.U. was 12, T.L. was 7,
and A.L. was 6. J.U. and D.U. were alleged to have been abused some time between June 1998 and
July 2003. T.L. and A.L. were alleged to have been abused some time between August 1999, just
after A.L.'s birth, and July 2003. Appellant was accused of penetrating J.U.'s anus with his sexual
organ (Count I), penetrating A.L.'s mouth with his sexual organ (Count II) and her sexual organ with
his finger (Count III), contacting and penetrating T.L.'s sexual organ with his sexual organ
(Count IV), and touching D.U.'s genitals with his genitals (Count V). See Tex. Penal Code
Ann. § 21.11 (West 2003) (indecency by contact), § 22.021 (West Supp. 2008) (aggravated
sexual assault). All four victims testified at trial; the youngest two children testified by closed-circuit
television. The jury convicted him on all counts and sentenced him to four terms of eighty years'
imprisonment and one twenty-year term, all to be served consecutively. On appeal, he contends that
article 38.071 of the code of criminal procedure is unconstitutional, that the evidence is legally
insufficient to support the convictions, and that his sentences were excessive and disproportionate
to the offenses for which he was convicted. We affirm the judgments of conviction.


Testimony by closed-circuit television

 In his first point of error, appellant complains that article 38.071, which provides that
a child witness younger than thirteen may testify through closed-circuit television rather than in the
courtroom and in front of the defendant, is unconstitutional because it violated his right to confront
witnesses against him. See Tex. Code Crim. Proc. Ann. art. 38.071, §§ 1, 3 (West Supp. 2008).

 T.L. and A.L. were permitted to testify via closed-circuit television rather than in
appellant's presence. At the time of trial, T.L. was seven years' old and A.L. was six. The abuse
was alleged to have occurred from the time T.L. was about one until she was five, and from some
time after A.L.'s birth until she was nearly four. At a pretrial hearing on whether to allow closed-circuit testimony, the State called the girls' three therapists and the girls' former foster mother, with
whom they lived from September 2003 until mid-2005, about six months before trial.

 Claudia Brown, a licensed professional counselor who primarily works with sexually
abused children, worked with both T.L. and A.L. from September 2003 until September 2004. She
testified at the hearing that T.L. told her that appellant had beaten T.L. with a belt, tied her up, taped
her mouth shut, touched her on her breasts and genitals, and "poked her with what she called 'it,'"
and that T.L. saw appellant "humping" on D.U. and on top of A.L. A.L. similarly told Brown that
appellant tied A.L. up, choked her, threatened her with a knife, played with her private parts, poked
her with his penis, and "taught [T.L.] how to do sex." Brown believed closed-circuit testimony was
necessary to protect the girls' welfare because both children are "very afraid of him." Brown
believed it would be "very traumatic" for T.L. and A.L. to face their father in court while they
testified and did not think that T.L. "would be able to speak the truth or say what she felt or what
happened to her in front of him," or that A.L. "would be able to speak." Brown testified that
T.L.'s and A.L.'s emotional distress in appellant's presence would go beyond mere nervousness,
excitement, or reluctance to testify. She thought that having to see him in court would "cause all the
trauma to come back up" and "undo all the work that the three of us therapists have tried to do." 

 Stephanie Casey, a therapist who treated the girls from October 2004 until July 2005,
believed a closed-circuit procedure was necessary to protect the girls because they were "fragile." 
She thought facing their father would be harmful and "could retraumatize them in that it could bring
back a flood of memories; they may be unable to speak; they might be upset, fearful, a variety of
things." Casey did not think the girls had seen appellant since being removed from the home and
thought "revisiting that would traumatize them." She thought they would be more than merely
nervous, excited, or reluctant to testify because appellant is their father and because "they're just
little girls. About all I can say is that because of their age; emotional maturity; development; and
coming to a courtroom, which is not their usual place; or facing the alleged perpetrator." 

 Elaine Brandon, the therapist who had been working with the girls since August 2005,
testified that she also thought closed-circuit testimony was necessary to protect the girls because,
"[b]ased on the change in their behavior and their interactions during therapy over the last month,
it indicates that in preparation for this trial that they've already begun to show distress and hav[e]
difficulties being able to deal with the situation again." She believed A.L. and T.L. would be
traumatized if they had to testify in appellant's presence "[b]ecause of the abuse from the past. It
has not been that long and posttraumatic stress disorder can come up at any time. And one of the
diagnostic criteria for that is reliving the situation, having it come back up; therefore, having to face
their father again would do that." She thought that the girls' emotional distress if required to testify
in appellant's presence would go beyond nervousness, excitement, or reluctance to testify.

 Bonnie Hinkston, the girls' former foster mother, testified about the girls' time with
her and their allegations against appellant. She said that when they were scheduled to visit their
biological mother, they "were always afraid that they were going to see" appellant. She thought that
allowing the children to testify through closed-circuit television was necessary to protect their
welfare "[b]ecause of their fear of him" and because T.L. "has been diagnosed with an expressive
language disorder . . . . And when she's put in a place where she's under stress, she just totally shuts
down. I don't think that she could sit here and testify with him sitting in the room. I think she would
totally shut down and would be--well, posttraumatic stress syndrome would come again." She
believed that T.L. and A.L. would be traumatized if they had to testify in front of appellant and that
their emotional distress would go beyond mere nervousness, excitement or reluctance to testify.

 Appellant called Dr. Michael Scott McNeil, (1) a psychologist who testified that
Hinkston's testimony "raise[d] red flags" for him because he thought she was mistaking the girls'
general nervousness about testifying as instead being fear of seeing appellant in court. He also
testified that he thought the therapists were "vague in relaying psychological symptoms" and that one
of them erroneously used a test intended for use on adults to diagnose T.L. In reviewing the
children's records, McNeil did not see "anything that would make me say, 'Well, yeah, this is
evidence of the trauma or symptoms related to posttraumatic stress disorder or nothing else.'" He
testified that in general, children and adults alike reacted to "the stresses of the courtroom," and that
studies had been conducted to monitor for "retraumatization" from courtroom exposure to a
perpetrator, which found that although there was a "possibility" that a victim might "flip out when
they get to the courtroom and they confront their accuser," "there's not much to that." He referred
to an article that concluded that there was little evidence to support the widespread belief in the
therapeutic community that a victim would be "retraumatized" by the perpetrator's trial, see Ulrich
Orth & Andreas Maercker, Do Trials of Perpetrators Retraumatize Crime Victims, 19 J.
Interpersonal Violence, Feb. 2004, at 212, (2) and stated that the research relied on by
Maryland v. Craig, 497 U.S. 836 (1990), which upheld similar provisions protecting child witnesses
from testifying in front of their alleged abusers, had been "savagely" criticized. McNeil admitted
that he had not spoken to the girls and could not say whether they would be traumatized by seeing
their father in court or whether it was in their best interest to testify outside of appellant's presence. 
He said he did not believe that "children should always have to come in and testify" before their
alleged abuser, and he thought that "[i]f you can demonstrate the likelihood of trauma," it would be
inappropriate to require a child to testify in the presence of the accused. He could not say whether
he disagreed with the witnesses' opinions that the girls would be traumatized by testifying in front
of appellant, saying "there's not enough information" to evaluate those opinions. The trial court
overruled appellant's objections and granted the State's motion.

 Appellant contends that "a growing body of research now indicates that testifying in
the presence of one's abuser is not as harmful to children as was thought at the time" the Supreme
Court decided Craig. Because the compelling State interest on which Craig was based is "no longer
valid," he argues, article 38.071 violates his constitutional confrontation rights. He further argues
that the statute is unconstitutional under the Supreme Court's opinion in Crawford v. Washington,
541 U.S. 36 (2004). Finally, he argues that McNeil's expert testimony about whether the children
displayed symptoms of trauma and could not testify in appellant's presence "was unrefuted by the
State" and, therefore, "should be accorded a substantial amount of weight" in our determinations. (3)

 In Craig, the Supreme Court held that a child victim's well-being may outweigh a
defendant's right to confront his accuser face-to-face. 497 U.S. at 853. The Court said that "face-to-face confrontation enhances the accuracy of factfinding by reducing the risk that a witness will
wrongfully implicate an innocent person" but is not required in every case. Id. at 846-47. The Court
observed that Maryland's procedure prevented the child from seeing the defendant as she testified
but otherwise "preserve[d] all of the other elements of the confrontation right," including requiring
that the child be competent to testify, sworn as a witness, and subjected to cross-examination. Id.
at 851. The Court held that the procedure "not only permit[s] a defendant to 'confound and undo
the false accuser, or reveal the child coached by a malevolent adult,' but may well aid a defendant
in eliciting favorable testimony from the child witness." Id. (quoting Coy v. Iowa, 487 U.S. 1012,
1020 (1988)). The Court noted a "growing body of academic literature documenting the
psychological trauma suffered by child abuse victims who must testify in court" and said that it
would not second-guess the Maryland legislature's determination about how best to protect child
victims from emotional trauma when testifying about their abuse. Id. at 855. The Court held that
"a State's interest in the physical and psychological well-being of child abuse victims may be
sufficiently important to outweigh, at least in some cases, a defendant's right to face his or her
accusers in court," and that, under the proper circumstances, a closed-circuit television procedure
for child witnesses does not "impinge upon" a defendant's rights under the Confrontation Clause. 
Id. at 852-53. Whether to allow a closed-circuit procedure must be made on a case-by-case basis to
determine whether a particular child needs that protection. Id. at 855. We review that decision for
an abuse of discretion. Barnes v. State, 165 S.W.3d 75, 84 (Tex. App.--Austin 2005, no pet.).

 On appeal, appellant cites to several papers concerning the welfare of child witnesses. 
However, appellant did not introduce those studies before the trial court, (4) and we will not consider
evidence that was not presented to the trial court. See Rangel v. State, 250 S.W.3d 96, 98
(Tex. Crim. App. 2008) (dismissing petitions for review as improvidently granted and stating, "We
refuse to examine the propriety of a trial judge's ruling based on evidence that the trial judge had no
opportunity to consider when he made his ruling."). "Once a scientific principle is generally
accepted in the pertinent professional community and has been accepted in a sufficient number of
trial courts through adversarial Daubert/Kelly[ (5)] hearings, subsequent courts may take judicial notice
of the scientific validity (or invalidity) of that scientific theory based upon the process, materials, and
evidence produced in those prior hearings." Hernandez v. State, 116 S.W.3d 26, 29 (Tex. Crim.
App. 2003). McNeil himself stated that there is a long-held theory in the therapeutic community that
a victim of crime, especially a child, may be traumatized or "retraumatized" by having to testify in
the alleged perpetrator's presence, although he asserted that recent studies have not found evidence
to support that theory. The only article introduced into evidence states that it was accepted that a
victim will frequently suffer "severe psychological stress" in the trial of the alleged perpetrator. Orth
& Maercker, 19 J. Interpersonal Violence, at 213. The other articles to which appellant cites on
appeal should have been given to the trial court for consideration: "The trial court hearing is the main
event for Daubert/Kelly gatekeeping hearings; it is not a try-out on the road to an appellate scientific
seminar." Hernandez, 116 S.W.3d at 30. We overrule appellant's first issue as far as it relies on
studies not presented to the trial court, and we hold that the trial court did not err in determining that
Craig was still valid in light of McNeil's testimony and the single study produced at the hearing.

 We next consider appellant's argument that McNeil's testimony showed that the
children would not be harmed by testifying in the same room as appellant. McNeil testified that he
was concerned by the evidence relied on and methodology used by the therapists in concluding that
the girls would be harmed by testifying in appellant's presence. However, he also said he had not
spoken to the girls and could not testify about whether they would be harmed. Although
McNeil's testimony may have cast some doubt on the therapists' testimony, it was not such that it
utterly invalidated the State's witnesses' testimony. Three experienced therapists who had worked
with the two children over a period of more than two years testified that the girls were very
frightened of their father and that they would be traumatized and perhaps even unable to speak if
forced to testify in his presence. The girls' former foster mother provided lay testimony to the same
effect. It was for the trial court to consider the competing evidence about how to handle these child
witnesses and to weigh the State's evidence about the children and the possible harm they might
suffer. See Barnes, 165 S.W.3d at 84-85. The trial court did not err in finding that the children
would likely be harmed if required to testify in the same room with appellant.

 As for appellant's argument that the Supreme Court's opinion in Crawford somehow
invalidates article 38.071, we disagree. In Crawford, the Court discussed a criminal defendant's
right to confront witnesses against him, noting that the Confrontation Clause should be interpreted
with a focus on avoiding the use of ex parte examinations as evidence in a criminal trial. 541 U.S.
at 50. The Court overruled its reasoning in Ohio v. Roberts, 448 U.S. 56 (1980), emphasizing that
availability and cross-examination, not the presence of indicia of reliability, are the central foci in
determining when a testimonial statement should be allowed into evidence. 541 U.S. at 68-69. This
does not, however, require a conclusion that, upon a proper showing of probable harm, allowing a
child witness to testify via closed-circuit television amounts to a Confrontation Clause violation. 
The girls testified from a conference room with their foster mother, the judge, and attorneys for the
State and appellant present, they were asked about the difference between truth and lies, and the jury
was able to observe them as they testified. Appellant's attorney was permitted to cross-examine the
girls, to have appellant and Dr. McNeil on the phone during questioning, and to pause questioning
to confer with appellant throughout his examinations. See Marx v. State, 987 S.W.2d 577, 580
(Tex. Crim. App. 1999) (reliability of child's testimony may be assured without face-to-face
encounter through "combined effect of the witness' testimony under oath (or other admonishment,
appropriate to the child's age and maturity, to testify truthfully), subject to cross-examination, and
the factfinder's ability to observe the witness' demeanor, even if only on a video monitor").

 Crawford's holding that confrontation is the key to the admissibility of testimony
does not overrule the Court's earlier statements that actual face-to-face confrontation is not
indispensable or required in "every instance in which testimony is admitted against a defendant." 
Craig, 497 U.S. at 847. In this case, the testimony was given before the trial judge and two
attorneys, and appellant was given the opportunity to cross-examine the girls. Thus, the trial court
presumably found that the State satisfied its burden of showing probable harm to the children, and
appellant's confrontation rights were sufficiently preserved by the closed-circuit procedure. It is not
for us to reconsider Craig or "to presume that Craig has been overruled sub silentio." Horn
v. Quarterman, 508 F.3d 306, 319 (5th Cir. 2007), cert. denied, 128 S. Ct. 2084 (2008) (terminally
ill witness testified via two-way television). We overrule appellant's challenge to the
constitutionality of article 38.071 and hold that the trial court did not err in allowing the procedure.


Sufficiency of the evidence

 In his second point of error, appellant argues that the evidence is legally insufficient
to support the jury's guilty verdicts on counts II, III, and IV (the aggravated sexual assaults of A.L.
and T.L.). He bases his attacks on his assertion that the evidence showed that A.L. and T.L. were
"helped" in their recollections by Hinkston, their former foster mother. 

 The evidence on which appellant relies to show that T.L.'s and A.L.'s testimony was
coached and unreliable is: 



 T.L.'s statement that Hinkston talked to T.L. about the alleged abuse, "remind[ed T.L.] about
those things,"and "helped [T.L.] remember" some of the allegations; 
 A.L.'s agreement when asked whether Hinkston had asked "questions about what happened"
and told A.L. "what happened," and her testimony that Hinkston "didn't say anything" or
"tell [A.L.] anything," that Hinkston "remind[ed A.L.] of a couple of stuff," and that
Hinkston would be lying if she said she had not reminded A.L. about anything; 
 Hinkston's testimony that the girls wanted to stay with her but knew they would be adopted
by someone else, that they knew Hinkston was not going to adopt them, and that she "never
indicated [she] was" going to adopt them; and
 T.L.'s testimony that she wanted to be adopted by Hinkston, that she talked to Hinkston "a
lot" about being adopted by her, and that Hinkston would be lying if "she were to say that
she never talked to [T.L.] about adopting" the girls.



Appellant argues that the described testimony shows that Hinkston coached the girls and was
untruthful in her own testimony and thus renders the evidence legally insufficient to support the
convictions in Counts II, III, and IV. We disagree.

 Viewing the evidence in the light most favorable to the jury's verdict, we ask whether
a rational trier of fact could have found the essential elements of the offense beyond a reasonable
doubt. Hampton v. State, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005); King v. State, 29 S.W.3d
556, 562 (Tex. Crim. App. 2000). "Although our analysis considers all evidence presented at trial,
we may not re-weigh the evidence and substitute our judgment for that of the jury." King, 29 S.W.3d
at 562. Appellant's argument focuses on whether A.L.'s and T.L.'s testimony should be believed. 
This is an attack on the credibility of the witnesses and the weight to be given their testimony. See
West v. State, 121 S.W.3d 95, 111-13 (Tex. App.--Fort Worth 2003, pet. ref'd) (defendant argued
child had motive to fabricate accusations; court held that child's testimony was legally sufficient
evidence and that, even considering evidence of possible motive, evidence was factually sufficient);
Lange v. State, 57 S.W.3d 458, 465 (Tex. App.--Amarillo 2001, pet. ref'd) (there was evidence from
which jury could have believed that defendant's ex-wife had manipulated daughter into making
accusations, but also sufficient evidence from which jury could have found appellant guilty; "While
there were some conflicts in complainant's repeated telling of the incidents and in the medical
evidence, as well as psychological testimony indicating appellant did not have tendencies to molest
children, those conflicts and the credibility of the witnesses were well within the province of the jury
to resolve, and its findings were not so contrary to the overwhelming weight of the evidence as to
be wrong and unjust."); Murray v. State, 24 S.W.3d 881, 885-87 (Tex. App.--Waco 2000, pet. ref'd)
(evidence sufficient despite evidentiary inconsistencies; argument that child was "obviously
coached" considered as factual-sufficiency issue); see also Quinton v. State, 56 S.W.3d 633, 639
(Tex. App.--Waco 2001, pet. ref'd) (in considering credibility of child's recanting of accusations,
"The trial court was in a position to judge [the child's] demeanor both at trial and at the hearing. 
Based on the record, we cannot say he abused his discretion in finding the recantation incredible.").

 We have considered the entire record, including the complained-of testimony, and
hold that the evidence is legally sufficient to support the jury's guilty verdicts on all five counts. We
overrule appellant's second point of error.


Sentencing

 In his third point of error, appellant argues that the jury's sentences violate his
constitutional protection against excessive and disproportionate punishment. He argues that the
sentences, which are to run consecutively, are "disproportionate to the offenses of which he was
convicted and excessive in light of the range of sentences received by other defendants convicted of
similar crimes." He asks us to consider that he "has never engaged in, or been accused of engaging
in, the type of behavior alleged in his indictment" and, "even if the allegations are accepted as true,
the events as alleged . . . were isolated instances of conduct" that "did not span over a period of years
and were not alleged to have occurred with any degree of frequency." Finally, he contends that the
children were encouraged by "well-meaning but overzealous counselors" to recount their allegations,
"with no regard to whether the incidents in question actually occurred" and "asks that this Court
consider these factors before it undertakes any proportionality analysis."

 To preserve alleged error related to excessive punishment, a defendant must have
made a timely request, objection, or motion at the trial court. Tex. R. App. P. 33.1(a)(1); Castaneda
v. State, 135 S.W.3d 719, 723 (Tex. App.--Dallas 2003, no pet.). After sentencing, appellant did
not object to the sentences other than to ask that they not be stacked, nor did he raise the argument
in a post-trial motion. Thus, appellant has not preserved this issue for our review.

 Even if he had preserved error, however, his argument fails. The punishment range
for aggravated sexual assault is life imprisonment or a term between five and ninety-nine years. 
Tex. Penal Code Ann. § 12.32(a) (West 2003). The range for indecency by contact is between two
and twenty years. Id. § 12.33(a) (West 2003). When the victim of aggravated sexual assault is
younger than six or if certain aggravating factors are present, the defendant must be sentenced to at
least twenty-five years. Id. § 22.021(f). If the defendant is convicted of multiple offenses arising
out of the same "criminal episode," defined as multiple offenses committed during the same
transaction or multiple connected transactions or if "the offenses are the repeated commission of the
same or similar offenses," id. § 3.01 (West 2003), and the convictions are for particular offenses,
including indecency with a child or aggravated sexual assault of a child, the sentences may run
concurrently or consecutively. Id. § 3.03(b)(2) (West Supp. 2008). As a general rule, punishment
within the statutory range is not unconstitutionally cruel and unusual. See, e.g., Jordan v. State,
495 S.W.2d 949, 952 (Tex. Crim. App. 1973); Winchester v. State, 246 S.W.3d 386, 388
(Tex. App.--Amarillo 2008, pet. ref'd); Willis v. State, 192 S.W.3d 585, 596 (Tex. App.--Tyler
2006, pet. ref'd); Jagaroo v. State, 180 S.W.3d 793, 802 (Tex. App.--Houston [14th Dist.] 2005,
pet. ref'd).

 As discussed, it was for the jury to determine whether the children were coached or
led into making false or even exaggerated accusations. We will not second-guess that decision and
will consider the appropriateness of the sentences in light of the jury's finding of guilt. As far as
appellant's contention that the abuse was "isolated" and did not occur "with any degree of
frequency," D.U. testified about several instances of abuse, J.U. testified about two specific
instances, and T.L. and A.L. testified about repeated acts of abuse; J.U. was the only victim who
testified with any specificity about the abuse. Further, even if the abuse had only occurred one time
to each child, the fact that appellant subjected four young children to serious sexual abuse would be
sufficient to support punishment within the range prescribed by statute. Appellant makes no
showing that an eighty-year sentence is somehow "grossly disproportional" to the gravity of the
offense of aggravated sexual assault of a young child, especially when the repeated nature of at least
some of the abuse is considered, as well as the age of the victims and the fact that there were four
victims in all. And, even if appellant had made that showing, he has not presented any comparisons
to sentences imposed on other criminal defendants in the jurisdiction or to sentences imposed for
similar conduct in other jurisdictions. See Willis, 192 S.W.3d at 596 (if sentence is "grossly
disproportionate" to gravity of crime and prior convictions, court next compares it to sentences
imposed on other defendants in same jurisdiction and those imposed for same offense in other
jurisdictions). Nor has he shown that the trial court acted improperly in stacking the sentences
consecutively. We overrule appellant's third and final point of error.


Conclusion

 Having overruled appellant's points of error, we affirm the judgments of conviction.


 ___________________________________________

 David Puryear, Justice

Before Chief Justice Law, Justices Puryear and Henson

Affirmed

Filed: December 31, 2008

Do Not Publish
1. In the reporter's record, Dr. McNeil's name is spelled "McNiel," and in the trial court's
orders, it is spelled "McNeal." Invoices and a letter provided by the doctor spell his name "McNeil." 
We will use the spelling that the doctor himself uses.
2. The article states, "It is not a matter of controversy that attendance at trials of
perpetrators frequently leads to severe psychological stress among crime victims." Ulrich Orth
& Andreas Maercker, Do Trials of Perpetrators Retraumatize Crime Victims, 19 J. Interpersonal
Violence, Feb. 2004, at 212, 213. However, "occasionally it is stated that trials could be
retraumatizing for the crime victims," and the authors found in their studies little empirical evidence
to support the "retraumatizing" theory, which they assert "should be used with caution." Id. at 213,
225.
3. Appellant also asserts that article 38.071 is premised on an improper assumption that a
defendant is guilty of the alleged abuse. This argument has been decided contrary to appellant's
position. Marx v. State, 987 S.W.2d 577, 581-82 (Tex. Crim. App. 1999).
4. Appellant only introduced into evidence the article discussed earlier authored by Orth and
Maercker, 19 J. Interpersonal Violence, at 212. He does not cite that article on appeal.
5. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993); Kelly v. State, 824 S.W.2d
568 (Tex. Crim. App. 1992).